455 So.2d 1112 (1984)
Morgan JAMISON, Jr., Appellant,
v.
STATE of Florida, Appellee.
No. 83-18.
District Court of Appeal of Florida, Fourth District.
September 19, 1984.
*1113 Richard L. Jorandby, Public Defender, Cathleen Brady, Asst. Public Defender, West Palm Beach, for appellant.
Jim Smith, Atty. Gen., Tallahassee, and Joy B. Shearer, Asst. Atty. Gen., West Palm Beach, for appellee.
WALDEN, Judge.
Jamison was charged with possession of methaqualone. He pled nolo contendere reserving the right to appeal the denial of his Motion to Suppress. He was adjudicated guilty and sentenced to three years imprisonment. He appeals. We reverse and remand.
The State accepts Jamison's version of the facts as follows:
Deputy Sheriff Gregory Younkin received a radio dispatch that a Marion Craft called in a complaint. The complaint was that a black male wearing long blue pants, no shirt, and a short afro was at the south end of Jensen Beach with a firearm. Deputy Younkin testified that he never talked to Marion Craft, and that he knew nothing about her reliability.
Deputy Younkin responded to the beach four minutes after the dispatch. He observed the appellant, a black male, inside the pavilion area. The appellant had no shirt and he was wearing long blue pants. There were a number of black males in the area. Initially, Deputy Younkin asked all the people inside the pavilion if anyone had a firearm. He then asked the appellant to lift his pants leg up. Deputy Younkin testified that if the appellant had refused to lift his pants leg up, he would have frisked him. After appellant lifted his pants leg up, Deputy Younkin noticed a bulge in appellant's left sock. He had not observed this bulge before. The appellant was asked to remove a brown paper bag which he was ordered to dump upon a table by Deputy Younkin. Deputy Younkin testified that he observed about 50 white pills.
On cross-examination, Deputy Younkin acknowledged that he did not see anything about the appellant that would lead him to believe that the appellant had a weapon prior to asking him to lift up his pants leg.
The State adds:
None of the persons at the Jensen Beach pavilion matched the description given in the dispatch except the appellant, as he was the only one wearing long trousers. Deputy Younkin testified he thought the bulge in the appellant's sock was caused by a small caliber firearm *1114 because in the past he has encountered people who have carried weapons in their socks.
Deputy Younkin directed the appellant to raise his pants leg rather than do a patdown because the presence of the other persons in the area concerned him and he wanted to keep an eye on everyone.
In our opinion Jamison was properly subjected to a stop and frisk pursuant to Section 901.151, Florida Statutes (1981). The facts were insufficient to constitute probable cause for an arrest at the time he was stopped.
However, we are concerned with the provisions of Section 901.151(5) (1981) as applied to this case. It provides:
(5) Whenever any law enforcement officer authorized to detain temporarily any person under the provisions of subsection (2) of this section has probable cause to believe that any person whom he has temporarily detained, or is about to detain temporarily, is armed with a dangerous weapon and therefore offers a threat to the safety of the officer or any other person, he may search such person so temporarily detained only to the extent necessary to disclose, and for the purpose of disclosing, the presence of such weapon. If such a search discloses such a weapon or any evidence of a criminal offense it may be seized.
Here the officer took these particular actions which constituted an illegal search: (1) He directed Jamison to lift up his pants leg; (2) He directed Jamison to take out what was in his sock when he observed a bulge in the sock; and (3) He directed Jamison to dump the contents of the brown paper bag that Jamison had removed from his sock. We hold that these actions exceeded the limitations found in Section 901.151, Florida Statutes (1981). It was not necessary for the officer to go to the extent he did in order to determine if Jamison had a weapon.
The law is clear that a protective frisk or "pat-down" must be limited to that which is necessary for the discovery of weapons. It may not extend beyond a pat-down of the suspect's outer clothing unless the pat-down or other circumstances lead the officer to believe that the suspect has a weapon. Meeks v. State, 356 So.2d 45 (Fla. 2d DCA 1978). See also Baldwin v. State, 418 So.2d 1219 (Fla. 2d DCA 1982); Fraley v. State, 374 So.2d 1122 (Fla. 4th DCA 1979).
Here the officer did not pat-down Jamison. He testified that he did not conduct a pat-down because he was concerned for his safety and wanted to keep an eye on others in the area. Accepting this excuse in toto for his failure to pat-down Jamison's outer clothing, we still feel that the officer could have satisfactorily protected his safety and still honored the defendant's rights by simply having Jamison hand the paper bag to the officer or place it on the ground and walk a distance away, whereupon the officer could have patted-down or felt the bag without opening it. Had he done so he would have felt pellets or pills and no weapon. Thus, there would have been absolutely no justification for proceeding or searching further into the contents of the bag.
We primarily base our reversal upon J.R.H. v. State, 428 So.2d 786 (Fla. 2d DCA 1983) which involved the search of a satchel under circumstances similar to those at hand. There, the Court held:
At most, Truesdale could have asked appellant if the bag contained a dangerous weapon or could have conducted a pat-down search of the bag. He was not entitled to inquire further than that into the nature of its contents or to conduct a full-scale search of the bag.
428 So.2d at 787-788.
Reversed and Remanded.
HERSEY and GLICKSTEIN, JJ., concur specially with opinions.
HERSEY, Judge, concurring specially.
In J.R.H. v. State, 428 So.2d 786 (Fla. 2d DCA 1983) relied upon by the majority, (1) the search resulted from an officer's recollection that there had been recent burglaries *1115 in the area and (2) the search was carried out in the presence of only two juveniles. There was no hint of a weapon and no other obvious threat to the officer's safety. In our case the search was occasioned by an individual's description of appellant which included the fact that he had a gun. This was neither an anonymous tip nor one from a confidential informant. It was a complaint by a citizen who gave her name and who supplied details of a crime in progress. Thus the officer, upon recognizing appellant from the description, had every reason to be apprehensive about the presence of a firearm. In addition, several individuals were standing around during the interrogation and the officer, again being concerned for his safety (not being certain who might have the weapon) wanted to keep an eye on everyone. Assuredly he could have "frisked" the brown paper bag. The question is: was he constitutionally mandated only to feel the bag rather than to request that appellant dump out the contents. In my view, a rule that requires the making of such fine distinctions in the presence of possible imminent peril asks too much of law enforcement personnel. Nonetheless, such cases as Robbins v. California, 453 U.S. 420, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1981) and United States v. Ross, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) appear to mandate the result we reach with respect to this "container search." I therefore reluctantly concur.
GLICKSTEIN, J., concurring specially.
I concur with Judge Walden's well-reasoned opinion and wish only to comment upon the law vis a vis the enforcement of law, while avoiding repetition of whatever expressions I may have earlier made on this subject in State v. Drowne, 436 So.2d 916, 921 (Fla. 4th DCA), pet. for rev. den., 441 So.2d 633 (Fla. 1983). Square one, to me, is the recent expression of the general rule  not the exceptions thereto  as verbalized by the United States Supreme Court in United States v. Ross, 456 U.S. 798, 102 S.Ct. 2157, 2166, 72 L.Ed.2d 572 (1982), wherein it commented upon the court's earlier opinion in United States v. Chadwick, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977):
In ruling that the warrantless search of the footlocker was unjustified, the Court reaffirmed the general principle that closed packages and containers may not be searched without a warrant. Cf. Ex parte Jackson, [6 Otto 727] 96 U.S. 727, 24 L.Ed. 877; United States v. Van Leeuwen, 397 U.S. 249, 90 S.Ct. 1029, 25 L.Ed.2d 282. In sum, the Court in Chadwick declined to extend the rationale of the "automobile exception" to permit a warrantless search of any movable container found in a public place.
(Footnote omitted.)
The court further said in discussing Robbins v. California, 453 U.S. 420, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1982), which was decided without a majority opinion:
One point on which the Court was in virtually unanimous agreement in Robbins was that a constitutional distinction between "worthy" and "unworthy" containers would be improper. Even though such a distinction perhaps could evolve in a series of cases in which paper bags, locked trunks, lunch buckets, and orange crates were placed on one side of the line or the other, the central purpose of the Fourth Amendment forecloses such a distinction. For just as the most frail cottage in the kingdom is absolutely entitled to the same guarantees of privacy as the most majestic mansion, so also may a traveler who carries a toothbrush and a few articles of clothing in a paper bag or knotted scarf claim an equal right to conceal his possessions from official inspection as the sophisticated executive with the locked attache case.
As Justice Stewart stated in Robbins, the Fourth Amendment provides protection to the owner of every container that conceals its contents from plain view. 453 U.S., at 427, 101 S.Ct. at 2846 (plurality opinion). But the protection afforded by the Amendment varies in different settings. The luggage carried by a traveler entering the country may be *1116 searched at random by a customs officer; the luggage may be searched no matter how great the traveler's desire to conceal the contents may be. A container carried at the time of arrest often may be searched without a warrant and even without any specific suspicion concerning its contents. A container that may conceal the object of a search authorized by a warrant may be opened immediately; the individual's interest in privacy must give way to the magistrate's official determination of probable cause.
Id. 102 S.Ct. at 2171 (footnotes omitted).
Finally, it said in rejecting the precise holding in Robbins:
We reaffirm the basic rule of Fourth Amendment jurisprudence stated by Justice Stewart for a unanimous Court in Mincey v. Arizona, 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290:
"The Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that `searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment  subject only to a few specifically established and well-delineated exceptions.' Katz v. United States, 389 U.S. 347, 357 [88 S.Ct. 507, 514, 19 L.Ed.2d 576] (footnotes omitted)."
Id. at 2172.
The following remarks of Chief Justice Burger in Chadwick are worth repeating here:
"In this Court the Government again contends that the Fourth Amendment Warrant Clause protects only interests traditionally identified with the home.[2] Recalling the colonial writs of assistance, which were often executed in searches of private dwellings, the Government claims that the Warrant Clause was adopted primarily, if not exclusively, in response to unjustified intrusions into private homes on the authority of general warrants. The Government argues there is no evidence that the Framers of the Fourth Amendment intended to disturb the established practice of permitting warrantless searches outside the home, or to modify the initial clause of the Fourth Amendment by making warrantless searches supported by probable cause per se unreasonable.
Drawing on its reading of history, the Government argues that only homes, offices, and private communications implicate interests which lie at the core of the Fourth Amendment. Accordingly, it is only in these contexts that the determination whether a search or seizure is reasonable should turn on whether a warrant has been obtained. In all other situations, the Government contends, less significant privacy values are at stake, and the reasonableness of a government intrusion should depend solely on whether there is probable cause to believe evidence of criminal conduct is present. Where personal effects are lawfully seized outside the home on probable cause, the Government would thus regard searches without a warrant as not `unreasonable.'
We do not agree that the Warrant Clause protects only dwellings and other specifically designated locales. As we have noted before, the Fourth Amendment `protects people, not places,' Katz v. United States, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967); more particularly, it protects people from unreasonable government intrusions into their legitimate expectations of privacy. In this case, the Warrant Clause makes a significant contribution to that protection. The question, then, is whether a warrantless search in these circumstances was unreasonable.
It cannot be doubted that the Fourth Amendment's commands grew in large measure out of the colonists' experience with the writs of assistance and their memories of the general warrants formerly in use in England. These writs, which were issued on executive rather than judicial authority, granted sweeping power to customs officials and other agents of the King to search at large for smuggled goods. Though the authority to search granted by the writs was not limited to the home, searches conducted pursuant to them often *1117 were carried out in private residences. See generally Stanford v. Texas, 379 U.S. 476, 481-485, 85 S.Ct. 506, 509-511, 13 L.Ed.2d 431 (1965); Marcus v. Search Warrant, 367 U.S. 717, 724-729, 81 S.Ct. 1708, 1712-1714, 6 L.Ed.2d 1127 (1961); Frank v. Maryland, 359 U.S. 360, 79 S.Ct. 804, 3 L.Ed.2d 877 (1959).
Although the searches and seizures which deeply concerned the colonists, and which were foremost in the minds of the Framers, were those involving invasions of the home, it would be a mistake to conclude, as the Government contends, that the Warrant Clause was therefore intended to guard only against intrusions into the home. First, the Warrant Clause does not in terms distinguish between searches conducted in private homes and other searches. There is also a strong historical connection between the Warrant Clause and the initial clause of the Fourth Amendment, which draws no distinctions among `persons, houses, papers, and effects' in safeguarding against unreasonable searches and seizures. See United States v. Rabinowitz, 339 U.S. 56, 68, 70 S.Ct. 430, 445, 94 L.Ed. 653 (1950) (Frankfurter, J., dissenting).
Moreover, if there is little evidence that the Framers intended the Warrant Clause to operate outside the home, there is no evidence at all that they intended to exclude from protection of the Clause all searches occurring outside the home. The absence of a contemporary outcry against warrantless searches in public places was because, aside from searches incident to arrest, such warrantless searches were not a large issue in colonial America. Thus, silence in the historical record tells us little about the Framers' attitude toward application of the Warrant Clause to the search of respondents' footlocker. What we do know is that the Framers were men who focused on the wrongs of that day but who intended the Fourth Amendment to safeguard fundamental values which would far outlast the specific abuses which gave it birth.
Moreover, in this area we do not write on a clean slate. Our fundamental inquiry in considering Fourth Amendment issues is whether or not a search or seizure is reasonable under all the circumstances. Cooper v. California, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967). The judicial warrant has a significant role to play in that it provides the detached scrutiny of a neutral magistrate, which is a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer `engaged in the often competitive enterprise of ferreting out crime.' Johnson v. United States, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948). Once a lawful search has begun, it is also far more likely that it will not exceed proper bounds when it is done pursuant to a judicial authorization `particularly describing the place to be searched and the persons or things to be seized.' Further, a warrant assures the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search. Camara v. Municipal Court, 387 U.S. 523, 532, 87 S.Ct. 1727, 1732, 18 L.Ed.2d 930 (1967).
Just as the Fourth Amendment `protects people, not places,' the protections a judicial warrant offers against erroneous governmental intrusions are effective whether applied in or out of the home. Accordingly, we have held warrantless searches unreasonable, and therefore unconstitutional, in a variety of settings. A century ago, Mr. Justice Field, speaking for the Court, included within the reach of the Warrant Clause printed matter traveling through the mails within the United States:
`Letters and sealed packages of this kind in the mail are as fully guarded from examination and inspection, except as to their outward form and weight, as if they were retained by the parties forwarding them in their own domiciles. The constitutional guaranty of the right of the people to be secure in their papers against unreasonable searches and seizures extends to their papers, thus closed against inspection, wherever they may be. Whilst in the mail, they can only be *1118 opened and examined under like warrant, issued upon similar oath or affirmation, particularly describing the thing to be seized, as is required when papers are subjected to search in one's own household.' Ex parte Jackson [6 Otto 727, 733] 96 U.S. 727, 733, 24 L.Ed. 877 (1878).
We reaffirmed Jackson in United States v. Van Leeuwen, 397 U.S. 249, 90 S.Ct. 1029, 25 L.Ed.2d 282 (1970), where a search warrant was obtained to open two packages which, on mailing, the sender had declared contained only coins. Judicial warrants have been required for other searches conducted outside the home. E.g., Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (electronic interception of conversation in public telephone booth); Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (automobile on private premises); Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964) (automobile in custody); United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951) (hotel room); G.M. Leasing Corp. v. United States, 429 U.S. 338, 97 S.Ct. 619, 50 L.Ed.2d 530 (1968) (office); Mancusi v. DeForte, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968) (office). These cases illustrate the applicability of the Warrant Clause beyond the narrow limits suggested by the Government. They also reflect the settled constitutional principle, discussed earlier, that a fundamental purpose of the Fourth Amendment is to safeguard individuals from unreasonable government invasions of legitimate privacy interests, and not simply those interests found inside the four walls of the home. Wolf v. Colorado, 338 U.S. 25, 27, 69 S.Ct. 1359, 1361, 93 L.Ed. 1782 (1949).
2 The Fourth Amendment provides:
`The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.'"
433 U.S. at 6, 97 S.Ct. at 2481, 53 L.Ed.2d at 545 (all other footnotes omitted).
Turning back to the present case, Judge Walden has cut through the chaff by his to-the-point opinion. Had the law enforcement officer been consciously aware of the law it was his duty to enforce, the improper, warrantless search would not have occurred in the absence of probable cause for the arrest. I view "law enforcement" as two buzz words, meaning enforcement of the law not only as it is but also as it should be unequivocally announced by the judiciary, clearly taught by law enforcement advisers, and plainly understood by law enforcement officers.