182 So.2d 252 (1966)
Marie Lee CASSO, alias Jean George, alias Helen O'Brien, Appellant,
v.
STATE of Florida, Appellee.
Ruth N. Kirschbaum, alias Pat Sherwood, alias Ruth Page, Appellant,
v.
STATE of Florida, Appellee.
Nos. 5282, 5283.
District Court of Appeal of Florida. Second District.
January 28, 1966.
*254 Hallard J. Greer, St. Petersburg, for appellants.
Earl Faircloth, Atty. Gen., Tallahassee, and Robert G. Stokes, Asst. Atty. Gen., Lakeland, for appellee.
PIERCE, Judge.
Appellants Casso and Kirschbaum (defendants) were jointly informed against in the Pinellas County Circuit Court for the offense of grand larceny, to-wit, the theft of $5,000 in money from one Mrs. Eva L. Shepard. Upon pleas of not guilty, the case was tried by a jury, resulting in a verdict of guilty as to each defendant. From the judgment of conviction pronounced against them, they have individually appealed to this Court. Separate briefs were filed here, but inasmuch as their contentions are the same, we consolidate their appeals for disposition in this opinion.
In seeking reversal defendants raise three points in this Court: (1) sufficiency of the evidence; (2) legality of the arrest and of the admission in evidence of certain articles seized from them at the time of their arrest; and (3) refusal of the trial Court to grant them a mistrial because of certain alleged language used by the prosecuting attorney in his closing argument to the jury.
The record filed here discloses that Mrs. Eva L. Shepard, an elderly lady of 80 years, was bilked out of $5,000 of her money by the two defendants in a variation of the old-time, but well known, "confidence game." Mrs. Shepard was standing on the Maas Brothers Department Store corner in downtown St. Petersburg, was approached by defendant Casso, a total stranger, and was told by Casso that she, Casso, had just collected $5,000 in cash from an insurance company for injuries to her "little girl," who had lost a leg in an automobile accident. Casso further stated she had "met a woman" who had found a paper bag on the ground, and upon opening it had discovered $600 therein. At just about that time the Kirschbaum woman came up and with embellishments confirmed the story of the paper bag. Kirschbaum further told Mrs. Shepard that "her boss" had advised her to keep quiet about the money "as it probably belonged to some gambler." She also stated that upon further searching the paper bag "back to the office" she or her "boss" had also found therein a man's billfold containing $6,000 more. They then, in a most ingratiating gesture, advised Mrs. Shepard that, inasmuch as all three of them knew of the find, the $6,600 would have to be divided three ways, $2,200 to each of them; however, to show "good faith," it would be necessary for Casso and Mrs. Shepard to advance to Kirschbaum $5,000 apiece. Casso thereupon turned over her supposed $5,000 insurance money to Kirschbaum.
The defendants then accompanied Mrs. Shepard in a taxicab to her apartment where she got her bankbook, then the three of them proceeded in the same taxicab downtown to the First Federal Savings & Loan Association, where Mrs. Shepard drew out the $5,000 from her own account, and turned it over to the two defendants on the sidewalk outside the bank. They then walked down the street to the building wherein the supposed "boss" had his office. While Casso and Mrs. Shepard remained downstairs Kirschbaum presumably went up into the building and later came back in a great rush, proclaiming to Mrs. Shepard that the man upstairs wanted to see her, accompanying such advices with the old excited carnival chant, "hurry, hurry, hurry." Mrs. Shepard did thereupon hurry upstairs to the supposed office but when she went in she was met only with blank stares and incredible expressions. Nobody in the office knew what she was talking about. It finally dawned on her what had happened, so she hurried back down to the sidewalk, only to find that the defendants had completely disappeared.
Mrs. Shepard then made quick contact with the police department and explained her situation. The police thereupon galvanized into action and did a remarkably *255 fast and efficient piece of investigative work. They quickly located the cab driver who had taken the three women to Mrs. Shepard's apartment and then back downtown and from him got a good description of the two defendants. From the descriptions so obtained, from Mrs. Shepard and the cab driver, coupled with the modus operandi employed by the defendants, the officers immediately got a positive identification of Casso by Mrs. Shepard from a police photograph. They then located a cab driver who had taken the two defendants from downtown St. Petersburg to the Eldorado Motel on the Gulf Beach where they were apparently staying. They then found another taxi driver who had taken the defendants from the Eldorado Motel to the Port-O-Call Motel at Tierra Verde, a distance of about five miles. They then went to the Port-O-Call and at about 9:30 P.M., the same day of the money transfer, the officers went up to the room rented by the defendants at the Port-O-Call. They knocked at the door, using the strategem of delivering a telegram, but the defendants, who were inside, refused to open up. The police, whose forces in the meantime had been augmented by sheriffs' deputies, then made known their identity as being from the Sheriff's office and demanded entrance, but defendants still refused to open the door. The officers then gained entrance by using a bellboy's pass key.
They found the two defendants inside the room, each lying on a twin bed, apparently waiting for the entrance of the officers. They then arrested the two defendants, seized two packed suit cases and contents, including part of the stolen money, and took the defendants down to jail. They were searched by a jail matron, who at that time did not find any more money. The next morning, upon a more detailed search by the matron, the money was found, located at a strategic place upon the person of each defendant. After the first money was found upon the person of Kirschbaum, whom the police matron knew as Pat Sherwood from past brushes with the law, said defendant thereupon volunteered that the rest of the money was upon the person of Casso, similarly located. Upon being apprised of such statement, Casso voluntarily produced the balance of the money from her person.
Neither of the defendants elected to take the witness stand, so the foregoing facts went to the jury, undenied and uncontradicted.
A. The first point as to insufficiency of the evidence to convict is wholly without merit. All former distinctions between larceny, embezzlement, and obtaining money or other property by false representations, have been abolished by statute and are now merged into the one offense of larceny. F.S. Section 811.021, F.S.A., provides in part: "A person who, with intent to deprive or defraud the true owner of his property * * * [t]akes from the possession of the true owner * * * by * * * false representations or pretense * * * any money * * * is guilty of larceny."
One obtaining personal property by trick, device, or fraud, intending to appropriate it, is guilty of "larceny" on subsequent appropriation. Murray v. State, 93 Fla. 706, 112 So. 575; McKinley v. State, 102 Fla. 632, 136 So. 380; Finlayson v. State, 46 Fla. 81, 35 So. 203; Knight v. State, Fla. 1950, 46 So.2d 497. A person is guilty of larceny who gets possession of money of another by means of fraud or trickery with the preconceived purpose to appropriate the money to his own use, on the theory that the fraud vitiates the consent of the owner who is held to retain constructive possession up to the time of conversion by the taker. Mehr v. State, Fla. 1952, 59 So.2d 259.
Defendants argue here that there was no evidence that the alleged false pretenses of defendants were, in fact, false; also that the evidence was deficient in establishing any intent to defraud. But such contentions ignore the well-established principle *256 of the law of larceny that this offense "may be proven by circumstantial evidence of such a nature and probative force that the jury could legally infer guilt therefrom beyond a reasonable doubt." Cross v. State, 96 Fla. 768, 119 So. 380; Bargesser v. State, 95 Fla. 401, 116 So. 11; Kirkland v. State, 82 Fla. 118, 89 So. 356; Johnson v. State, 157 Fla. 328, 25 So.2d 801.
The language used by the Supreme Court of Florida in Murray v. State, supra, is quite apropos here:
"The evidence in this case might well have sustained a conviction for larceny, for there was ground for the inference that possession of the money was obtained by trick, device, or fraud. Neither of the accused persons took the stand. The question of the intent, which governed them when they acquired possession of the money, had to be inferred from all the circumstances. If the court and jury saw fit, by inference from the evidence, to give them credit for a lawful intent at the time they induced the aggrieved party to intrust them with the possession of her money as her agents for the purpose disclosed by the evidence, and found that the crime consisted of their unlawful appropriation of the money after so obtaining lawful possession, it hardly lies in the mouth of either to say that the verdict of embezzlement should be set aside upon the ground that the evidence showed that they intended to appropriate the money to their own use at the time they induced the injured party to turn it over to them, and that the agency thus vested was induced by their own trick or fraud  hence that they were guilty, if guilty of anything, of larceny, and not of embezzlement. This plaintiff in error introduced no evidence before the jury to assist them in determining when the criminal intent was formed, and he cannot complain because the jury, on the facts shown by the record, accorded to him a lawful intent at the time he and his coprincipal obtained the possession of the money. That they were both principals  acting together, aiding and abetting each other  and that they were each assuredly guilty of either embezzlement or larceny is made plain. We think, under all the facts in the case, the question of intent at the time the possession was obtained was one for the jury to determine, and that no sufficient ground is shown why this court should set aside their finding thereon." (Emphasis supplied)[1]
The representations made in the instant case by the defendants to the victim were: the imminent receiving of $5,000 from an Insurance Company for injuries to "the little girl"; the finding of the paper bag containing $600; the supposed advice of Kirschbaum's "boss" not to report the finding because it probably "belonged to gamblers"; the further finding of $6,000 more in the paper bag; the existence of an office on the third floor of the building by Kirschbaum's "boss"; etc. Intent to deceive and defraud may be inferred from the foregoing representations, together with the additional facts such as: the immediate disappearance *257 of the defendants from the company of the victim; their flight by taxicab to their temporary lodging at the Gulf Beach motel; their subsequent immediate flight five miles away to the Port-O-Call at Tierra Verde; the renting of a room there; their first denial after arrest that they had any of the money; the subsequent discovery of the stolen money secreted in the unusual human depositories, etc.
The questions of the existence of the requisite felonious intent and of the falsity of the pretenses are for the jury to determine, subject always to the legal requirement that there must be some substantial competent evidence from which the jury may reasonably infer and conclude that the intent was to defraud and that the pretenses were false. In the instant case the evidence for such purpose was amply sufficient.
B. The second point urged by defendants to this Court, namely, that the arrest of the defendants was illegal and the subsequent search of their persons and effects and the seizure of the incriminating evidence was illegal, thereby precluding its admission in evidence, is likewise without merit. In the first place such evidence is, at best, merely cumulative, in that the undenied evidence as to the intent to defraud and the falsity of the representations made to induce the victim to part with her money, as hereinbefore discussed, was amply sufficient to make a case appropriate for the jury to decide, aliunde the fruits of the arrest and search.[2]
In the second place, the arrest, with its consequent search and seizure, was legal. The arrest of suspected felons without a warrant is justified, and evidence obtained by search of their persons or effects upon the arrest, will not be suppressed, where the arresting officers had probable cause, in view of their prior investigation, to believe that such persons were then engaged in violating the law. And in determining whether the officers had such probable cause to believe that a felony was being committed so as to justify the arrest without warrant, sufficiency of the known facts on the part of the officers must be determined, not by an analysis of the effect of each known circumstance in isolation, but by a conclusion as to what a reasonable man, knowing all the facts which the officers knew from their prior investigation, would have believed under all the circumstances. Rogers v. State, 1947, 158 Fla. 582, 790, 30 So.2d 625.
F.S. Section 901.15, F.S.A., provides in part:
"A peace officer may without warrant arrest a person * * * when he has reasonable ground to believe that a felony has been or is being committed and reasonable ground to believe that the person to be arrested has committed or is committing it."[3]
*258 As an incident to an arrest made under these conditions, the arresting officer has the power, indeed it is his duty, to search the person so arrested and to seize anything found on his person or in his possession or under his control tending to show that such person is guilty of a violation of the law. Brown v. State, Fla. 1950, 46 So.2d 479.
The defendants here vigorously argue that while the officers were outside their Port-O-Call motel door and before they made entry into the room, they had ample opportunity to procure a search warrant. But assuming arguendo[4] that a magistrate or judicial officer could have been located at that time of the night and a search warrant caused to be issued by him, it would have been a legally useless gesture, inasmuch as, under all the circumstances then existing, it was wholly unnecessary in order to make the entry into the room, and the arrest and search, legal. As stated by the Supreme Court of Florida in Brown v. State, supra, as follows (text 46 So.2d 481):
"The fact that at the time of arrest the arresting officer may or may not have in his possession a warrant authorizing him to make a search is quite without legal significance; as is also the fact that such search warrant as he may have in his possession at the time may later prove to be insufficient. For the Federal Constitutional provision with respect to searches and seizures does not say that a search shall be made only under authority of a search warrant nor does it prescribe that a search shall not be made without a search warrant if it is practicable to secure one. The prohibition in the provision is against unreasonable searches and seizures. See Fourth Amendment to Federal Constitution; United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653."
The test of validity is made clear from the following additional language in Brown (46 So.2d text 481):
"What is a reasonable or valid search in any case is a question of fact for the court to determine upon due consideration of the circumstances and manner under which the search is made. Haile v. Gardner, 82 Fla. 355, 91 So. 376. The test in such a case may well be, as is true in the case at bar, whether at the time of the arrest the officer had reasonable ground to believe and did believe that a felony was being committed in his presence by the person to be arrested; whether as an incident to the arrest the articles seized were found in the possession, custody or control of the person arrested; and whether the articles searched for and seized had been or were being utilized in perpetrating a crime for which the arrest was made and hence were property subject to seizure."
This Second District Court has had occasion to specifically follow the Brown and Rogers cases, supra, in an opinion written by Chief Judge Allen, involving validity of an arrest without warrant, followed by a search and seizure. Bozeman v. State, Fla. App. 1958, 102 So.2d 648. We reaffirm Bozeman here, and further hold that the learned trial Judge in the case sub judice, under all the evidence submitted, was fully warranted in denying all objections of defendants to admission in evidence of the articles of personalty seized from the defendants at the time of their arrest.
Defendants cite Benefield v. State, Fla. 1964, 160 So.2d 706, but that case is direct *259 authority for legality of the instant arrest and search. In Benefield the officers made entry into the home of the accused through the front door without first requesting admittance and without announcing their authority and purpose. The Supreme Court held that such acts vitiated the entry and subsequent arrest of the accused inside the home because the officers failed to comply with the provisions of F.S. Section 901.19 (1), F.S.A., which reads as follows: "An officer, in order to make an arrest * * * when authorized * * * for a felony without a warrant, may break open a door or window of any building in which the person to be arrested is or is reasonably believed to be, if he is refused admittance after he has announced his authority and purpose" (emphasis supplied). In the instant case the officers complied with the provisions of the quoted section as scrupulously as if they had been following a written script.
C. Defendants urge as their last contention upon this appeal that the trial Judge erred in not declaring a mistrial, upon motion of defendants, when the prosecuting attorney, in his argument to the jury, used the words "flim-flam," "pigeon drop," and "life savings," the latter term referring to the $5,000 of Mrs. Shepard. Timely objections were made to all three quoted remarks.
The trial Judge at first observed that, if the jury believed Mrs. Shepard's testimony, the words "flim-flam" might be permissible argument, and as to the language "pigeon drop," the Court disclaimed knowledge of the meaning. However, at the conclusion of the colloquy the Court carefully and even laboriously instructed the jury to disregard all argumentative references to such terms. As to the "life savings" remark, the prosecuting attorney voluntarily withdrew the same in the presence of the jury, immediately upon the objection being made thereto. The Court denied defendants' motions for mistrial based upon such incidents.
It is elementary that it is not every error that may be committed in the trial of a criminal case that will provide the basis for a reversal of the judgment; such error must be fundamental and prejudicial. Section 924.33, Florida Statutes, F.S.A., provides as follows:
"No judgment shall be reversed unless the appellate court after an examination of all the appeal papers is of the opinion that error was committed which injuriously affected the substantial rights of the appellant. It shall not be presumed that error injuriously affected the substantial rights of the appellant."
Citing such statutory provision, the Supreme Court of Florida in Cornelius v. State, Fla. 1950, 49 So.2d 332, said:
"This Court has specifically held that a reversal should not be ordered unless the error complained of was prejudicial or harmful to the substantial rights of the accused and that the introduction of improper or inadmissible evidence must be prejudicial in order to warrant a reversal."
Applying the foregoing tests to the instant case, it cannot be said that the remarks of the State Attorney to the jury, supra, were so damning and inflammatory as to vitiate the verdict of conviction rendered by the jury, especially in the light of the prompt actions of the trial Judge and of the prosecuting attorney immediately after said remarks were made.
Counsel, in arguing a case to the jury, invariably use language that is generally understood by a person in the ordinary walk of life because the composition of the average jury is made up of just such persons. Slang expressions are commonplace in our ordinary mode of vocal discussions, and ofttimes their meaning is more generally understood by the average person than if the proper and precise language of Webster's dictionary were used. The words *260 "flim-flam" and "pigeon-drop" would fall in that category. Certainly they are neither of the character that would in any way "inflame the passions." And the term "lifesavings" could not, by any stretch of the imagination, accrue to the status of being prejudicial error. See Goddard v. State, 143 Fla. 28, 196 So. 596.
The judgments appealed from are and each of them is
Affirmed.
ALLEN, C.J., and LILES, J., concur.
NOTES
[1] At the time the Murray case was decided a distinct technical difference existed between the crimes of larceny and embezzlement, the principal distinction being the intent of the accused at the time of the taking of the money or property from the victim. In Murray the defendant was charged in two counts with larceny and embezzlement respectively, and was convicted only of embezzlement. It was argued upon appeal that, upon facts strongly analogous to the case at bar, the offense, if any, could only have been larceny and not embezzlement. But the Supreme Court upheld the conviction on the theory that, for all the evidence showed, the fraudulent intent of the accused to deprive the owner of his money might, from the evidence, have been formed in the mind of the accused after he gained possession of the money. Here, of course, no such difficulty is presented, because all technical distinctions between larceny and embezzlement have been discarded by statute.
[2] Alleged errors in the admission of testimony, not affecting the legality of the trial itself, is not ground for reversal where the other evidence as a whole leaves no room for reasonable doubt of the accused's guilt. Hopkins v. State, 52 Fla. 39, 42 So. 52; Rhodes v. State, 65 Fla. 541, 62 So. 653; Bell v. State, 65 Fla. 505, 62 So. 654; Edington v. State, 81 Fla. 634, 88 So. 468. And this rule has been applied in cases involving admission of evidence allegedly obtained by an illegal arrest and search. Perez v. State, Fla.App. 1963, 151 So.2d 686; Dorsey v. United States, C.A., Fla. 1949, 174 F.2d 899, cert. den. 338 U.S. 950, 70 S.Ct. 479, 94 L.Ed. 586, also 340 U.S. 878, 71 S.Ct. 116, 95 L.Ed. 639. And so, even in a murder prosecution, involving evidence found in a search of a defendant's home without a warrant. Jeffcoat v. State, 103 Fla. 466, 138 So. 385.
[3] Said F.S. Section 901.15 F.S.A., also provides that where the person to be arrested has committed either a felony or misdemeanor in the presence of the officer, "the arrest shall be made immediately or on fresh pursuit." (Emphasis supplied). Inasmuch as, at the time of the arrest in the instant case, defendants still had the stolen money on their persons, and the officers had been trailing them at a fast clip from downtown St. Petersburg to the Gulf Beaches, thence to Tierra Verde, that the officers gained access to their motel room while "on fresh pursuit."
[4] This is indeed a far-fetched assumption, inasmuch as the officers at that time had definite information that the defendants had told the cab driver as he was transporting them from the Eldorado motel on the Gulf Beaches to the Port-O-Call, that they were going to "have dinner and then go to Jacksonville."