461 So.2d 265 (1985)
J. Fernando BANDERAS, Monica L. Banderas, Pablo Rodrigo Banderas, Milton R. Bengoa, Pan American Bank of Miami, N.A., P.A.P. General Hospital, Voight, Inc., a/K/a Voight Hospital, American Baptist Hospital, St. John's Hospital, Florida Aviation Corp., Banla International Sales Corp., et al., Appellants,
v.
BANCO CENTRAL del ECUADOR, an Agency of the Government of Ecuador, Appellee.
Nos. 83-1477, 83-2070.
District Court of Appeal of Florida, Third District.
January 2, 1985.
*267 Andrew C. Pavlick, Miami, Lawrence D. Felder, Fort Lauderdale, Shepherd D. Johnston, Miami, for appellants.
McDermott, Will & Emery and Charles A. Intriago, Mark L. Yeager and Kevin T. Keating, Chicago, Ill., for appellee.
Before SCHWARTZ, C.J., and HENDRY and FERGUSON, JJ.
HENDRY, Judge.
The individual and corporate defendants appeal from a final judgment entered after a non-jury trial on Banco Central del Ecuador's ("Central Bank") cause of action for common law fraud and damages under the Florida Racketeer Influenced and Corrupt Organizations Act ("RICO"), sections 895.01-895.06, Florida Statutes (1981). The trial court, after making extensive findings of fact and conclusions of law, found for the Central Bank and awarded it treble and punitive damages in the amount of $12,104,503.83, as well as other relief set out infra. We affirm the trial court's award.

I.
Central Bank, the Ecuadorian equivalent of the Federal Reserve Bank, filed suit alleging participation by the individual and corporate defendants (with the exception of Pan American Bank which was a third-party stakeholder) in a fraudulent scheme relating to Ecuador's medical assistance and import programs. The Ecuadorian government operated a humanitarian social program from 1976 until May 13, 1982, which was administered by the Central Bank. This program extended a favorable currency exchange rate to Ecuadorian citizens who received medical treatment in the United States; the import program extended a favorable currency exchange rate to those citizens importing into Ecuador certain types of machinery. The claimant or his representative would submit his hospital bill and a check for payment of the bill in Ecuadorian sucres; the Central Bank then exchanged the sucres provided by the claimant into the requisite amount of U.S. dollars at a rate of 24.95 sucres per dollar, the market rate being 28 to 45 sucres to one U.S. dollar. Central Bank absorbed the difference. The bank paid either the claimant or his representative, or paid the bill directly, or authorized payment by wire transfer through various correspondent banks in the U.S.. Central Bank alleged the defendants entered into and conducted a pattern of racketeering activity in violation of the Florida RICO Act by presenting fraudulent statements for medical services by defendant hospitals which were non-existent and by presenting fraudulent invoices for machinery that was never imported into Ecuador.
At trial, Central Bank introduced evidence and testimony and called certain individual defendants, including J. Fernando Banderas and Monica L. Banderas, his wife, as adverse witnesses. The Banderases refused to answer any questions, invoking their fifth amendment right to remain silent. Other evidence showed that Central Bank had begun an investigation in 1982 which subsequently disclosed that between June, 1981 and April, 1982, it had paid some 70 bills totalling $3.7 million from the fictitious hospitals for patients whose names included the individual appellants, as well as entirely fictitious persons or persons not involved in the scheme; representatives who presented the bills to Central Bank were sometimes certain individual appellants, but the names used usually belonged to actual citizens of Ecuador who were not involved in the scheme; there was a great deal of movement of funds among the bank accounts of the "hospitals" and other corporate defendants (including accounts in Pan American Bank, N.A.); the Banderases were implicated in the import fraud scheme in which six fictitious invoices paid by Central Bank totalled some $1.4 million. These monies were deposited in the Banla International Sales Corporation bank account. All checks in Ecuadorian *268 sucres for the purchase of U.S. dollars for payment of the six fictitious invoices were drawn on the bank account of J. Fernando Banderas in Ecuador, as were some of the checks for payment under the medical assistance program. Banderas also endorsed certain checks to the "hospitals" and was a signatory, along with Monica, on certain bank accounts in the names of the corporate defendants. All individual defendants were implicated by name or by endorsement or signatory listings on bank accounts. Evidence of Central Bank's losses was that it cost the bank $851,131.00[1] plus lost interest of $87,946.00 to provide the fraudulent medical assistance benefits and that the six fictitious invoices cost the bank $367,610.00 and $38,256.00 in lost interest for the import assistance program. Total damages from the two programs amounted to $1,344,944.87. The defendants' conduct resulted in the termination of the medical assistance program. The defendants put on no evidence in their behalf.
The trial court's findings of fact, conclusions of law and judgment order reflected the essential facts and found the defendants had committed the acts alleged, constituting obtaining property by false personation, § 817.02, Fla. Stat. (1981); mail fraud, 18 U.S.C. § 1341 (1976); wire fraud, 18 U.S.C. § 1343 (1976); and transportation of stolen goods, 18 U.S.C. § 2314 (1976). These activities were held to constitute a pattern of racketeering activity in violation of §§ 895.03(1) and 895.03(3), Fla. Stat. (1981), entitling plaintiff to treble and punitive damages under the RICO Act. Plaintiff's (trebled) damages of $4,034,834.00 and punitive damages of twice that amount of $8,069,669.00 were awarded as against the defendants jointly and severally, the defendant corporations were dissolved, their assets to be distributed by receivers, and Pan American Bank was ordered to deliver to plaintiff all sums in the accounts of defendants there. Damages were also awarded based on common law fraud. The court additionally concluded an adverse inference could be drawn against the Banderases, and another defendant, Bengoa, for failing to testify, although it did not need to rely on such inference in reaching its findings of fact or conclusions of law.

II.
Appellants raise four issues on appeal: 1) whether the civil damages provisions of RICO were improperly applied to these defendants because there was no showing that they were connected to organized crime; 2) whether the civil damages provisions were improperly applied to a mere "garden variety" fraud case; 3) whether the evidence at trial was insufficient to prove that the defendants committed the acts alleged in the complaint; and 4) whether the amount of punitive damages awarded by the trial court was excessive. Each of these issues will be discussed, if only briefly; however, none of them has any merit.
In disposing of appellants' first issue, we note that the question of whether application of civil RICO provisions requires a finding of a nexus to "organized crime" is one of first impression in this state. In Carlson v. State, 405 So.2d 173 (Fla. 1981), and Moorehead v. State, 383 So.2d 629 (Fla. 1980), both involving criminal prosecutions under RICO, a variation on this issue was raised by appellants when each attacked the statute as being unconstitutionally overbroad because it included certain misdemeanors unrelated to organized crime. Since appellants in both cases had been charged with serious crimes, the Florida Supreme Court ruled that appellants lacked standing to raise the argument and thus, it did not reach the question of whether a connection to organized crime was required. The closest the Florida Supreme Court has come to a pronouncement on this subject is Bowden v. State, 402 So.2d 1173 (Fla. 1981), another criminal RICO prosecution, where the court, in rejecting appellants' attack on the statute as *269 unconstitutional because it imposed strict liability without requiring criminal intent or knowledge, stated:
By requiring a continuity of criminal activity as well as a similarity and interrelatedness between these activities, the target of RICO Act prosecutions will be, appropriately, the professional or career criminal and not non-racketeers who have committed relatively minor crimes.
Id. at 1174 (e.s.) We believe that the court in Bowden could have used the more restrictive term "member of organized crime" had it intended to so limit the target of the statute. Instead, the court appropriately focused on the nature of the activities rather than the status of the violators.
The Florida RICO Act, promulgated in 1977, is nearly identical to the federal RICO statute, 18 U.S.C. §§ 1961-1968 (1970), passed as Title IX of the Organized Crime Control Act of 1970. Thus, we can also look to a wealth of material on the federal RICO statute for guidance on this issue. The legislative history shows that Congress was clearly concerned, during the drafting of this bill, with the constitutional problems associated with trying to limit the statute's target to "organized crime" only; that is, that the statute would not survive attacks on the grounds that it was unconstitutionally overbroad or that it created status crimes. See 116 Cong.Rec. 18,913-14; 35,204; 35,343-46 (1970), reprinted in 1970 U.S. Code Cong. & Ad. News 4007.[2] Status crimes, related as they are to the old English bills of attainder, are especially disfavored. Cf. Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) (state cannot make drug addiction a crime); Lanzetta v. New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939) (state cannot make being a "gangster" a crime). Secondly, Congress deliberately made the scope of the statute as broad as possible "to avoid opening loopholes through which the minions of organized crime might crawl to freedom." See Sutliff, Inc. v. Donovan Companies, Inc., 727 F.2d 648, 654 (7th Cir.1984); 116 Cong. Rec. 18,940 (1970). Congress chose the only course available to it which would effectuate the broad purpose of the statute without creating serious constitutional issues. It imposed enhanced sanctions for the types of activities which were characteristic of "organized crime". 116 Cong. Rec. 18,940. Thus, all persons who engage, over a period of time, in activities which Congress has defined as being "racketeering activities" are subject to criminal prosecution or civil litigation under RICO.
Against this background, it is now well established in the federal courts that it is not necessary to prove a nexus to organized crime in order to obtain damages in a private civil RICO suit. Battlefield Builders, Inc. v. Swango, 743 F.2d 1060, 1063 (4th Cir.1984); Alexander Grant & Co. v. Tiffany Industries, Inc., 742 F.2d 408, 413 (8th Cir.1984); Sedima S.P.R.L. v. Imrex Co., Inc., supra, 741 F.2d at 492; Alcorn County, Mississippi v. U.S. Interstate Supplies, Inc., 731 F.2d 1160, 1167 (5th Cir.1984); Owl Construction Co. v. Ronald Adams Contractor, Inc., 727 F.2d 540, 542 (5th Cir.1984); Sutliff, Inc. v. Donovan Companies, Inc., supra, 727 F.2d at 654.
Appellants' second argument, that the trial court permitted Central Bank to turn a "garden variety" fraud case into a treble damage civil RICO action is, paraphrasing Mr. Justice Cardozo, to spread the study of horticulture to unaccustomed fields. United States v. Constantine, 296 U.S. 287, 299, 56 S.Ct. 223, 228, 80 L.Ed. 233, 241 (1935) (Cardozo, J., dissenting). We cannot accept appellants' argument. *270 The statute makes no distinction between levels or degrees of fraudulent activity. See § 895.02(1)(a)16. Thus, courts are not in a position to decide whether certain frauds are "garden variety" subject only to simple compensatory and possible punitive damages, and whether other frauds are "exotic arrangements" meriting the full range of enhanced penalties available under RICO. Schacht v. Brown, 711 F.2d 1343 (7th Cir.), cert. denied, ___ U.S. ___, 104 S.Ct. 508, 78 L.Ed.2d 698 (1983). Fraud is not so easily parsed.[3]
Section 895.02(4) defines "pattern of racketeering activity" as:
[E]ngaging in at least two incidents of racketeering conduct that have the same or similar intents, results, accomplices, victims, or methods of commission or that otherwise are interrelated by distinguishing characteristics and are not isolated incidents, provided at least one of such incidents occurred after the effective date of this act and that the last of such incidents occurred within 5 years after a prior incident of racketeering conduct.
This case fits precisely within the parameters of the statute. This was not a technical securities or business fraud. This was a well organized, on-going, systematic, criminal scheme devised by appellants to defraud the government of Ecuador  their own government.
At some time prior to June, 1981, the individual appellants and Florida Aviation Corp. (FAVCO) and Banla[4] formed a conspiracy for the express purpose of carrying out this scheme. In furtherance of this scheme, these appellants created four fictitious "hospitals" in three different states (Florida, Texas and Missouri). Appellants sent "statements", in medical terminology, on invoices which they caused to be printed in the names of these non-existent hospitals. They sent seventy of these statements over the course of thirteen months, which the Central Bank paid in good faith. The bank didn't realize there was a problem with the medical assistance program until the spring of 1982 when an employee at Southeast Bank noticed that the address listed for St. John's Hospital corresponded to a vacant lot. Appellants earned over $851,000.00 on a few dollars invested in printing and a medical dictionary. Innocent banks were drawn into the scheme. As a result, there were also violations of the federal mail and wire fraud statutes. At the same time, these appellants were perpetrating the import fraud in which they used their expertise in international sales to fill out the requisite paperwork and obtain the necessary license so that it appeared as if the goods actually had been imported into Ecuador. That scheme netted them over $351,000.00. Those checks were deposited in accounts belonging to Banla International Sales Corp.  a further violation of the Florida *271 RICO statute. As a result, this case presents one version of precisely the sort of activity that should, without controversy, fall within the statute's application.
Appellants next argue that the evidence produced at trial was insufficient to prove that the individual defendants committed the alleged acts. We disagree. The trial court found that there was substantial, competent evidence to prove that the appellants engaged in all of the complained of acts in furtherance of the scheme and conspiracy. We will not disturb these findings on appeal. Rollins v. Phillips, 444 So.2d 1160 (Fla. 3d DCA 1984); Hull v. Miami Shores Village, 435 So.2d 868 (Fla. 3d DCA 1983).
Because of appellants' refusal to testify, there was little direct evidence, but substantial circumstantial evidence, which linked these appellants with the conspiracy; that is to say, there was almost no direct evidence tending to prove that these appellants, as opposed to people posing as them, opened bank accounts, sent fictitious hospital bills to the Central Bank and deposited monies fraudulently received. "Such direct evidence is not indispensible for it is beyond peradventure that circumstantial evidence is also quite sufficient to prove a case." Bunyak v. Clyde J. Yancey & Sons Dairy, Inc., 438 So.2d 891, 893 (Fla. 2d DCA 1983), pet. for rev. denied, 447 So.2d 885 (Fla. 1984).
The strongest direct evidence came from Johnny Wall, a defendant who was voluntarily dismissed during the presentation of appellee's case in chief. Mr. Wall, an employee of FAVCO, made an in-court identification of J. Fernando Banderas and testified that on one occasion Mr. Banderas had given him an envelope to deliver to Southeast Bank. The envelope contained an authorization to pick up a check from the bank. Mr. Wall picked up a check in the amount of $61,596.16 payable to St. John's Hospital, signed for it, and gave it to Mr. Banderas. Other witnesses identified Mr. Banderas as being linked to FAVCO and Banla. An employee of Southeast Bank testified to two telephone conversations she had with a man who identified himself as Fernando Banderas. In the first, he stated that he represented St. John's Hospital and inquired why the hospital had not received payment of a bill from Central Bank. Later, she telephoned Banla and again spoke with a man who identified himself as Fernando Banderas.
The circumstantial evidence consisted of the testimony of an expert handwriting analyst, Edward Whittiker, Commander of the Metro-Dade Police Department's Crime Laboratory Bureau. Mr. Whittiker examined five original ink signature cards bearing the signatures of "J. Fernando Banderas" and "Monica L. Banderas". He then compared these signatures to the signatures on corporate reports of FAVCO and BANLA, checks, invoices and other documents bearing their signatures and found that they were the same. Thus, the same two people opened two accounts for Voight Hospital, a personal account for Fernando Banderas and Monica L. Banderas, and a corporate account for FAVCO and one for Banla, and also signed FAVCO and Banla corporate records and documents. Therefore, appellants' sub silentio suggestion that perhaps there were phantom people signing the Banderases' names on everything in sight is ludicrous and is not to be believed.
Appellants Milton R. Bengoa and Pablo Rodrigo Banderas did not appear at trial at all but were represented by counsel. Mr. Bengoa also refused to answer questions at his deposition, exercising his privilege against self-incrimination. Mr. Bengoa maintained a personal bank account into which Central Bank checks payable to St. John's Hospital were deposited. A number of checks payable to two currency exchange houses in Quito, Ecuador were written on this account. Pablo Banderas was a signatory on the Voight Hospital account and the P.A.P. General Hospital account. Both Bengoa and Banderas presented photo identification when they opened their respective accounts.
Based on the foregoing, we find that there was sufficient substantial, competent *272 evidence to prove that appellants were the perpetrators of the fraud.
Appellants' final issue on appeal, that the punitive damages award is excessive, is without merit. Punitive damages, which are permitted in section 895.05(7), are appropriate where fraudulent conduct is accompanied by malice, moral turpitude, wantonness, willfulness, or reckless indifference to the rights of others. Walsh v. Alfidi, 448 So.2d 1084 (Fla. 1st DCA 1984). They are to be measured by the enormity of the offense. Arab Termite & Pest Control of Florida, Inc. v. Jenkins, 409 So.2d 1039 (Fla. 1982).
Appellants' contention that the award must bear a relationship to the compensatory damage award, a "rule of thumb" approach limiting punitive damages to two or three times the compensatory damages, is simply wrong. The law is clear that although punitive damages must bear a relationship to the fact of injury or invasion of legal right, that is, there must have been some injury for which compensatory damages were assessed, they need not bear a reasonable relationship to the amount of actual damages awarded by the jury. Smith v. Vining, 407 So.2d 1048 (Fla. 3d DCA 1981).
Finally, it is proper to set aside a punitive damages award if the manifest weight of the evidence shows that the amount of punitive damages assessed is out of all reasonable proportion to the malice, outrage, or wantonness of the conduct. Arab Termite & Pest Control v. Jenkins, supra, 409 So.2d at 1043. In finding that the manifest weight of the evidence in the record supports this award, we set out the trial court's conclusion of law to show the true dimensions of this case:
This court further concludes that the trebling of the compensatory damages of the Central Bank is an insufficient award to do justice in this case. From its inception, the scheme and conspiracy of the defendants was clearly and purely criminal. These defendants defrauded their own government and fellow citizens, and in doing so, they jeopardized, if not destroyed, humanitarian programs that were instituted by a developing nation for the betterment of its populace. In committing this fraud and conversion, the defendants acted willfully and wantonly, utilizing innocent banks in the State of Florida, as well as corporations formed under its laws. Accordingly... .
Ecuador's medical assistance program, which helped Ecuadorian citizens obtain medical care in the United States, was halted on May 13, 1982, following the discovery of the appellants' fraud.
The judgment appealed is AFFIRMED.
NOTES
[1] The direct cost amount represents the difference in U.S. dollars between the sucre value, at the free market rate of exchange, of the payments made to the fictitious hospitals and the amount of sucres received by Central Bank from the fictitious patients' representatives.
[2] Many courts find it useful to cite to the legislative history as a way of showing, either approvingly or disapprovingly, the legislative intent behind a statute remarkable in its scope and penalties. Compare United States v. Turkette, 452 U.S. 576, 101 S.Ct. 2524, 60 L.Ed.2d 246 (1981) with Sedima S.P.R.L. v. Imrex Co., Inc., 741 F.2d 482 (2d Cir.1984). Commentators also do exhaustive searches of legislative history when writing on the subject of RICO. Cf. Blakey, The RICO Civil Fraud Action in Context: Reflections on Bennet v. Berg, 58 Notre Dame L.R. 237 (1982); Note, Civil RICO: The Temptation and Impropriety of Judicial Restriction, 95 Harv.L.R. 1101 (1982).
[3] To be sure, some federal courts have expressed deep concern over the breadth of the RICO statute. See Sedima S.P.R.L. v. Imrex Co., Inc., supra, 741 F.2d at 487 ("It [RICO] has ... led to claims against such respected and legitimate `enterprises' as the American Express Company, E.F. Hutton & Co., Lloyd's of London, Bear Stearns & Co. and Merrill Lynch, to name a few defendants labeled as `racketeers' in civil RICO claims resulting in published decisions.") The statute certainly has been put to uses which Congress may not have envisioned. See Dan River, Inc. v. Icahn, 701 F.2d 278 (4th Cir.1983) (defensive use of RICO to stave off hostile corporate take-over). Some commentators have suggested removing whole areas of the law, securities, for example, from RICO's purview as a way of limiting the statute's scope. See Note, Civil RICO and "Garden Variety" Fraud  A Suggested Analysis, 58 St. John's L.R. 93 (1983). While all of this is very interesting, it still remains the case that it is not the judiciary's role to weigh the costs involved in applying the enhanced penalties under this statute and then to search for ways to modify the plain language in order to narrow its scope. That remains, as always, the duty of the legislative branch. Moss v. Morgan Stanley, Inc., 719 F.2d 5, 21 (2d Cir.1983).
[4] It is not clear from the record whether FAVCO and Banla were legitimate corporations used to hide or "launder" the money received through the fraudulent activities or whether they were illicit enterprises created before the inception of the scheme to serve the same purpose. Either way, the two corporations fall under the definition of "enterprise" in section 895.02(3).