570 So.2d 955 (1990)
TINWOOD N.V., Appellant,
v.
SUN BANKS, INC., Etc., et al., Appellees.
No. 89-2281.
District Court of Appeal of Florida, Fifth District.
November 8, 1990.
Rehearing Denied December 13, 1990.
*957 J. Alfredo de Armas of Munilla & Associates, P.A., Arnaldo Velez of Taylor, Brion, Buker & Green, Miami, and James C. Adkins, Tallahassee, for appellant.
Thomas B. DeWolf, Marc P. Ossinsky, and John L. O'Donnell, Jr., of DeWolf, Ward, O'Donnell & Hoofman, P.A., Orlando, for appellees Figueredo, Euro-American Inv. Corp., Inc. and Euro-American Properties, S.A.
No appearance for appellee, Sun Banks, Inc.
HARRIS, Judge.
Robert Figueredo located certain property in Orange County that he believed would be a good investment opportunity for foreign investors. He incorporated Tinwood, N.V. under the laws of the Netherlands Antilles with himself as president and general manager. He then prepared an offering brochure and distributed it to proposed foreign investors. In the brochure he offered stock in Tinwood to raise $3,600,000 (half in cash; half in notes) to acquire 54.3 acres of property ($66,285 per acre). In the brochure, he indicated that for his services he would receive 25 percent of the profits from the resale of the property. Investors testified that Figueredo represented that this would be his only compensation from the project.
The offering was successful. Investors deposited $1,800,000 cash into one of Figueredo's corporations, Euro-American Properties, (EAP) S.A.  Escrow Account (Tinwood, N.V.),[1] for their stock. They also delivered notes in that amount to complete the purchase price of the real estate and to purchase their stock. The property was purchased and Figueredo and another of his corporations, Euro-American Investment Corp. (EAIC), became managing agents for Tinwood. Figueredo and EAIC were removed as managing agents in 1985 and, after a review of the corporate files and audits and other information, Tinwood brought this action against Figueredo and his corporations (defendants) alleging (1) violation of securities law (Chapter 517, Florida Statutes); (2) civil theft; (3) conspiracy; (4) common law fraud; (5) misrepresentation and (6) RICO violations (Chapter 895, Florida Statutes).
After a six week jury trial, the trial judge entered a directed verdict in favor of defendants on all counts. We affirm in part and reverse in part.

*958 FACTS
In early April, 1982, Figueredo, as president of EAIC, located a 54.3 acre parcel of property owned by Waters and Seward. A letter dated April 15, 1982 reflects preliminary negotiations between the parties and references a purchase price of $43,500 per acre, with Figueredo being responsible for all sales commissions which the sellers understood to be $8,000 per acre. On July 15, 1982, the parties signed a letter which referenced a purchase price of $43,000 per acre plus commissions. This letter, which the sellers sent to Figueredo stated, "We understand you are prepared to execute a standard contract for sale and purchase." The parties did execute a contract dated June 30, 1982, but it referenced a purchase price of $66,285.00 per acre. The total purchase price reflected by the contract (including a "wrap-around mortgage" of $1,799,275) was $3,599,275. Commission was to be paid by the sellers per separate agreement. The contract was executed by Figueredo acting as Trustee for Tinwood, N.V., a "Netherlands Antilles Corporation in formation" and a closing date of October 12, 1982 was agreed upon.
Following the closing Figueredo and EAIC served as Tinwood's managing agents until they were removed in August, 1985. During their period of service, they received on behalf of Tinwood a total of $1,800,000 cash from investors. After their removal, the new managing directors of Tinwood became involved in settlement negotiations with several entities holding mortgages on the property and received a number of documents which gave rise to the instant lawsuit. One document, labeled "Management Agreement," was dated October 10, 1982, two days before the first closing.[2] According to the agreement, Waters and Figueredo (as EAIC) divided the difference between the "sale price" for the land ($43,350 per acre) and the cost of the land to Tinwood ($66,285 per acre), one third to Waters and two thirds to EAIC. The "Management Agreement" was not contained in the documents or records of Tinwood obtained from Figueredo. Figueredo admitted he did not disclose the "Management Agreement" to shareholders of Tinwood because he did not consider it a document of the corporation.
Roger Handley of the state comptroller's office investigated Waters and Seward's activities and testified Figueredo told him the land was purchased for approximately $43,000 per acre. Seward testified the price was approximately $44,285.
The September 30, 1983 financial statement of Tinwood reflected that corporate funds used for purchase of the land, including interest and taxes, totalled $3,610,826. The statement also disclosed that a brokerage commission of $243,000 was paid, at the first closing, to EAP, an affiliate of Figueredo. Figueredo also received a $33,600.52 syndicate fee at the first closing.
There was also evidence of two sets of closing statements for the September, 1983 closing. One set, prepared by the closing agent, attorney Woods, discloses the existence of two unsecured promissory notes given by Figueredo on behalf of Tinwood as well as various sums Figueredo was to receive, including a joint venture contribution of $300,000. The second set does not disclose these details. Tinwood received the second set.

DISCUSSION
When considering the propriety of a motion for directed verdict, the trial court must consider the evidence in a light most favorable to the non-moving party and if there is any evidence to support a possible verdict for such party, a directed verdict is improper. Pritchett v. Jacksonville Auction, Inc., 449 So.2d 364 (Fla. 1st DCA 1984); Howarth v. Moreau, 430 So.2d 576 (Fla. 5th DCA 1983). Stated otherwise, a directed verdict is proper where the evidence and reasonable inferences therefrom fail to prove a prima facie case in support of the cause(s) of action pleaded. Golden v. Morris, 55 So.2d 714 (Fla. 1951); Hartnett *959 v. Fowler, 94 So.2d 724 (Fla. 1957). See generally, Holmes v. Don Mealey Chevrolet, Inc., 468 So.2d 552 (Fla. 5th DCA 1985); Williams v. Meyer, 474 So.2d 1214 (Fla. 5th DCA 1985); Jennings v. Ray, 484 So.2d 1267 (Fla. 5th DCA 1986). Thus the broad question on this appeal is whether, viewing the evidence in a light most favorable to Tinwood, the corporation adduced evidence or reasonable inferences therefrom to establish a prima facie case on one or more of its causes of action.

VIOLATION OF CHAPTER 517

(Securities Violation)
This is the type of action which is personal to the investors and could not be maintained on their behalf by the corporation. The corporation after all did not buy the alleged securities, rather persons who were not parties to this lawsuit did. See E.F. Hutton & Co., Inc. v. Rousseff, 537 So.2d 978 (Fla. 1989) (§ 517.211 requires buyer/seller privity). Indeed, in the absence of a joinder of the private investors, the court could not require repayment to such private investors. Wee Mac Corp. v. State, 301 So.2d 101 (Fla. 3d DCA 1974). The directed verdict on this claim is affirmed.

BREACH OF FIDUCIARY DUTY

(Agents Failure to Disclose Secret Profit)
Under Florida corporate law,[3] a director has the duty to perform his duties "in good faith, in a manner he reasonably believes to be in the best interests of the corporation, and with such care as an ordinarily prudent person in a like position would use under similar circumstances." § 607.111(4), Fla. Stat. (1985); Old Port Cove Property Owners v. Ecclestone, 500 So.2d 331 (Fla. 4th DCA 1986), rev. denied, 509 So.2d 1118 (1987). A director or officer of a corporation, acting as its agent in the purchase of property, occupies a position of trust and confidence with respect to the corporation and owes the corporation a fiduciary duty to exercise the utmost good faith and to make full disclosure of all facts within his knowledge pertaining to the transaction. Pryor v. Oak Ridge Development Corp., 97 Fla. 1085, 119 So. 326 (1928); United Homes, Inc. v. Moss, 154 So.2d 351 (Fla. 2d DCA 1963). In the absence of a showing that he acted with the consent of the shareholders, an officer or director is precluded from making any secret profit or deriving any personal advantage at the expense of the corporation. Pryor v. Oak Ridge Development Corp., supra; United Homes, Inc. v. Moss, supra; Avila South Condominium Association v. Kappa Corp., 347 So.2d 599 (Fla. 1977); Old Port Cove Property Owners v. Ecclestone, supra. Where the officer or director makes a secret profit, he will be required to disgorge it. Fort Myers Development Corp. v. J.W. McWilliams Co., 97 Fla. 788, 122 So. 264 (1929), on remand, 105 Fla. 13, 140 So. 902 (1932); United Homes, Inc. v. Moss, supra; see also Quinn v. Phipps, 93 Fla. 805, 113 So. 419 (1927); Restatement of Restitution, § 138 (a fiduciary who has acquired a benefit by a breach of his duty as fiduciary is under a duty of restitution to the beneficiary); Restatement of Agency 2d § 403 (if an agent receives anything as a result of his violation of a duty of loyalty to the principal, he is subject to a liability to deliver it, its value, or its proceeds, to the principal).
Tinwood presented a prima facie case showing Figueredo and EAIC arranged for a secret profit at the expense of and without the knowledge of the corporation. Defendants argue that the evidence showed the property which Tinwood purchased in 1982 and 1983 for $3.6 million had a fair market value at the time of trial in excess of $8 million. Even so, this evidence does not preclude recovery. See Donahue v. Davis, 68 So.2d 163 (Fla. 1953) (fact that profit had been realized despite *960 fraud practiced by one joint adventurer upon his co-adventurers was immaterial to their right to an accounting from him).
The directed verdict on this claim is reversed.

FRAUD AND MISREPRESENTATION
Recovery under these theories is only possible if a prima facie case of fraud against the corporation (as opposed to the investors) was presented. This requires evidence of misrepresentation to the corporation and resultant damages sustained by the corporation. See Amazon v. Davidson, 390 So.2d 383 (Fla. 5th DCA 1980). Tinwood argues numerous separate misrepresentations and concealments of material fact were made by defendants to the corporation resulting in damages to the corporation. We agree only as to the following misrepresentation of purchase price as $3,600,000, or $66,285 per acre.
The cost of the real property as represented in the offering memorandum was $3,600,000. As noted above, there is evidence that the actual purchase price of the land was approximately $43,500 per acre for a total of much less than the stated amount and that this information was not contained in the corporate records. A jury could conclude that the true purchase price was concealed from the corporation by its managing directors and that the corporation was damaged by paying $22,785.00 per acre more than the purchase price. The directed verdict on this claim is reversed.

CIVIL THEFT
Tinwood paid $3,600,000 for the land. There is evidence that Figueredo obtained the property for a sum less that $3,600,000 but did not account to the corporation for the difference.
Civil theft is recognized under section 812.035, Florida Statutes (1985). Defendants, citing Rosen v. Marlin, 486 So.2d 623 (Fla. 3d DCA 1986), rev. denied, 494 So.2d 1151 (1986) and Futch v. Head, 511 So.2d 314 (Fla. 1st DCA 1987), rev. denied, 518 So.2d 1275 (1987), point out that a dispute over the amount of money that a person owes may justify a breach of contract action but does not become a theft which is actionable under section 812.035. However, the mere existence of a contractual relationship between parties does not preclude an action for civil theft. Nova Flight Center, Inc. v. Viega, 554 So.2d 626 (Fla. 5th DCA 1989). An embezzlement whereby the defendant lawfully obtains possession of the plaintiff's funds and thereafter converts said funds to his own use will justify an action for civil theft. Masvidal v. Ochoa, 505 So.2d 555 (Fla. 3d DCA 1987); Puchner v. Drexel Burnham Lambert, Inc., 498 So.2d 550 (Fla. 3d DCA 1986). Furthermore, as stated in State v. Oates, 330 So.2d 554, 556 (Fla. 4th DCA 1976):
One obtaining personal property by trick, device, or fraud, intending to appropriate it, is guilty of larceny on subsequent appropriation. A person is guilty of larceny who gets possession of money of another by means of fraud or trickery with the preconceived purpose to appropriate the money to his own use, on the theory that the fraud vitiates the consent of the owner who is held to retain constructive possession up to the time of conversion by the taker. Casso v. State, 182 So.2d 252 (Fla.App.2d 1966).
In this case, evidence was presented that the property was bought at much less than $66,285 per acre, and that corporate funds were secretly disbursed to defendants. Further, that defendant Figueredo attempted, through the use of a second set of closing documents, to conceal the actual details of the closing from the corporation. The question of whether Figueredo was guilty of civil theft of funds belonging to Tinwood should have been submitted to the jury. The directed verdict on this count is reversed.

RICO ACT
In order to establish a RICO violation, Tinwood was required to show "a pattern of racketeering activity." §§ 895.02(4), 895.03, Fla. Stat. (1985). In a case somewhat analogous to this one, State v. Lucas, 570 So.2d 952 (Fla. 3d DCA 1990), *961 the Third District noted that the United States Supreme Court, in H.J., Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) held that to prove a "pattern of racketeering activity" under the federal RICO act (from which the Florida RICO Act was derived), a plaintiff must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity. Id. 109 S.Ct. at 2900. The Supreme Court continued:
Continuity is both a closed  and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. [Citation omitted] ... A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement ... Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the threat of continuity is demonstrated.
Whether the predicates proved establish a threat of continued racketeering activity depends on the specific facts of each case ... A RICO pattern may surely be established if the related predicates themselves involve a distinct threat of long-term racketeering activity, either implicit or explicit .. . In other cases, the threat of continuity may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business ... [,] a long-term association that exists for criminal purposes ... [,] or a regular way of conducting ... [an] ongoing legitimate business.
Id. 109 S.Ct. at 2902.
The Third District then held that the information before it was properly dismissed because it failed to allege continuity in the racketeering conduct alleged. The court explained:
[A]ll the predicate racketeering acts alleged in the information span only a brief period of six months and threaten no future long-term racketeering conduct. Indeed, the six-month fraudulent scheme alleged was aimed solely at a discrete set of victims, namely, former Wellington Precious Metals' clients derived from Wellington client lists, and was not directed at the public at large; obviously, such a scheme poses no threat of long-term existence as it necessarily must terminate when the Wellington client lists are exhausted. Stated differently, the alleged fraudulent scheme had but a limited set of victims covering only a short-term operation with no reasonable possibility of continuous existence. This being so, this short-run fraudulent scheme utterly fails to satisfy the continuity prong of the "pattern of racketeering activity" element to the charged RICO offenses.
State v. Lucas, 570 So.2d at 955.
The instant case is nearly identical. Defendants' conduct had a limited purpose, was directed to a limited set of investors and covered only a short-term operation with no reasonable possibility of continuous existence.
Tinwood relies on Banderas v. Banco Central del Ecuador, 461 So.2d 265 (Fla. 3d DCA 1985) for the proposition that a pattern of racketeering activity was established here; however, in that case, the defendants had set up four fictitious hospitals in order to perpetrate the fraud which was conducted over a ten month period and the court noted, "This was not a technical securities or business fraud. This was a well organized, ongoing, systematic, criminal scheme devised by [plaintiff]." Banderas at 270. The instant case is factually much closer to H.J., Inc. than Banderas. Tinwood failed to establish a prima facie case against defendants under the RICO Act, and the directed verdict on this count is affirmed.

CONCLUSION
The trial court erred in directing a verdict for defendants on Counts II, III, V, VI *962 and XXXIX of Tinwood's amended cross claim. The final judgment is reversed and the cause remanded for a new trial on those counts.
AFFIRMED in part, REVERSED in part, and REMANDED.
COBB and GOSHORN, JJ., concur.
NOTES
[1] Defendants urge that since the cash was "investor money" deposited into Euro-American Properties escrow account, even if a wrong occurred it was against the investors and not Tinwood. We disagree. The cash was delivered in order to acquire the property and in exchange for stock in Tinwood. If, because of the actions of defendants, the value received for the stock by Tinwood was reduced, then Tinwood also was wronged.
[2] The property was actually purchased in two closings, one occurring on October 12, 1982 and the other occurring on September 15, 1983.
[3] Defendants urge that the law of the Netherlands Antilles controls. We reject this contention. Here Figueredo had his office in Florida, the corporate purpose (investing in Florida property) was to be carried out in Florida, and a corporate bank account was maintained here. Florida had the most "significant relationship" to the transaction. See State Farm Mutual Automobile Insurance Company v. Olsen, 406 So.2d 1109 (Fla. 1981); see generally Restatement (Second), Conflict of Laws, § 309.