[Crim. No. 6799. Fifth Dist. May 18, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
RONALD LEE GORDON et al., Defendants and Appellants.

**COUNSEL**

W. Michael LaRoche and Michael L. Gums, under appointments by the Court of Appeal, for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Joel Carey and Jana L. Tuton, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**WOOLPERT, J.**—This case involves the arrest of a drunken father and son caught transporting marijuana in the back of a pickup truck on Highway

99. Before allowing the defendants' truck to be towed away, the arresting officer opened the door to a cab-high camper shell covering the truck bed. The officer was attempting to determine if anything of value or anyone was inside. The odor of marijuana then became readily apparent. The truck was towed to the police station and searched after the owner of the truck, still possibly drunk, gave oral consent to search, and signed a consent form. The search turned up over 50 pounds of marijuana. We are asked to decide if the lower court's ruling that the search was a lawful one was correct.

On September 16, 1982, an information was filed in Fresno County Superior Court charging the defendants with multiple violations. Defendants filed Penal Code section 1538.5 motions, which were denied. Both defendants pled guilty to violation of Health and Safety Code section 11359 (possession of marijuana for sale). All other counts were dropped. All special allegations of being armed were stricken.

Both defendants were sentenced to the middle prison terms of two years. Each defendant now argues that the trial court abused its discretion.

## THE FACTS

Around midnight of August 6, 1982, Officer Aldridge, a police sergeant for the City of Kingsburg, was dispatched to investigate a possible drunk driver. The dispatch was the result of a mutual aid request from the California State Highway Patrol. The highway patrol had received a telephone call from a concerned citizen.

Aldridge and his partner drove their marked patrol car to the intersection given in the dispatch; however, they were unable to locate the described vehicle. A citizen stopped them, identified himself as the original informant, and pointed out the vehicle in question as it was leaving a cafe parking lot. The officers, in pursuit of the vehicle, followed it onto Highway 99. The vehicle, a 1980 Chevrolet pickup truck with a cab-high camper shell on the back, drove very slowly (approximately 25-30 miles per hour). Aldridge turned on his overhead emergency lights in order to signal the driver to pull over and stop. The driver of the truck did not attempt to stop for approximately one-fourth to one-half mile and was not successful in stopping the vehicle until his third attempt to pull over. On one attempt, the vehicle almost went out of control.

When the truck was stopped, Aldridge approached the driver's side. Ronald Lee Gordon (Ronald) was in the driver's seat. His eyes were very glassy and bloodshot. He seemed unaware of what was happening, and uncon-

cerned about it as well. Aldridge noticed the distinct odor of alcohol emanating from the vehicle and the driver.

Before being asked to produce his driver's license, Ronald reached for something on his right side. In fear for his own safety, Aldridge grabbed Ronald and told him not to move. The officer saw, in plain view, a small caliber semi-automatic weapon on the seat. The gun was later determined to be loaded, although no bullet was in the chamber.

Aldridge ordered the driver from the truck, but found Ronald to be so unsteady on his feet that he had to be helped in exiting the vehicle. Ronald was arrested for driving under the influence. His father, Chestley Gordon (Chestley), was seated on the passenger side. He was ordered from the vehicle and placed under arrest by Aldridge's partner. Chestley was arrested for being drunk in public.

Aldridge asked Ronald what he wanted done with the vehicle. Ronald did not answer. Aldridge did not ask the passenger. The officer then decided to call for a tow truck so the vehicle could be taken to a tow yard for safe storage: there appeared to be items of value inside.

Aldridge attempted to look into the camper to be sure no one was inside prior to towing. Having had no success with earlier inquiries, he did not ask either defendant if anyone was inside. Aldridge also wanted to see if there was anything inside so valuable that defendants might want it taken out. He could see a mattress by shining a flashlight beam through the windows, but the windows were too dirty for him to see through to be reasonably assured that no one was inside.

He then unlatched and opened the camper shell door, which was actually more of a window above the truck tailgate. Without entering the back of the truck, Aldridge saw in plain view numerous items inside: kitchen goods; household goods; a mattress. Either just after opening the window, or perhaps just before, Aldridge smelled marijuana. We will assume the odor was not noticed until after the window was opened. The odor was emanating from within the enclosed area of the truck bed.

Aldridge had training and extensive experience in the detection of marijuana. He then had the vehicle secured and towed to the police station for impounding, rather than towed to the tow yard for storage. (See Veh. Code, §§ 22651 and 22850.) He intended to get a search warrant or a "permit" to search the vehicle once it was at the station.

During booking, both defendants were asked who owned the vehicle. Ronald did not respond, but Chestley admitted being the registered owner.

He had been given *Miranda* warnings and offered to talk prior to making the admission. Chestley also gave the response, "Yes, go ahead" when asked if he would consent to police searching the truck. This consent occurred approximately one hour after the stop and arrest.

At this time Chestley also signed a consent to search form. Initially, he had difficulty reading the form. Aldridge inquired as to the difficulty and discovered that Chestley wore glasses. Aldridge got the glasses for him and Chestley looked at the form for a short time and then said, "Hell, I don't need to read it, there's nothing in there anyway." Aldridge testified that in his opinion Chestley was still under the influence for purposes of driving, but not for purposes of understanding what he was discussing.

Early the following morning, about five to six hours after booking, the truck was searched. No warrant was ever procured. Besides the already mentioned items, there was a chest of drawers and nine recently taped cardboard boxes. The boxes contained approximately 54 pounds of marijuana and a weight scale.

### DEFENSE CONTENTIONS

Defendants argue that the initial entry into the camper shell was unlawful on several grounds: (1) a camper is equivalent to a car trunk, not a passenger compartment, and therefore carries with it a greater expectation of privacy; (2) no probable cause existed to search the camper as a search incident to arrest; (3) the camper could not be entered and searched as part of an inventory search; (4) even if Aldridge reasonably believed exigent circumstances existed, less onerous alternatives than the warrantless entry into the camper shell were available; and (5) defendants had a greater expectation of privacy in the camper shell because it should reasonably have been viewed by the officer as being a home rather than an automobile. (See *People* v. *Carney* (1983) 34 Cal.3d 597 [194 Cal.Rptr. 500, 668 P.2d 807].)

### EXIGENT CIRCUMSTANCES

We need not respond to each of the defense contentions as abstract propositions, nor need we become concerned whether federal or state standards apply in this case. When we apply state standards to these facts we conclude the People carried the burden of proving that the roadside search of defendants' truck and camper was reasonable. (*People* v. *Hill* (1974) 12 Cal.3d 731, 747-749 [117 Cal.Rptr. 393, 528 P.2d 1], overruled on other grounds, *People* v. *DeVaughn* (1977) 18 Cal.3d 889, 896, fn. 5 [135 Cal.Rptr. 786, 558 P.2d 872].) Assuming for this purpose that the officers were dealing with an automobile type vehicle, after the arrests the officer

was entitled to look inside for other occupants. (*Id.*, at p. 748, fn. 17.) It was proper to do so whether looking for someone hiding who might be dangerous, or for the protection of a sleeping or similarly intoxicated occupant whose life might be endangered when the truck was removed from the highway to a storage area some distance away. Because the vehicle had to be moved, it was also proper, at least superficially, to check the interior for personal property which might be damaged in the move. Because of the intoxicated condition of the father and son, and the failure of a bona fide attempt to get directions from Ronald, the officer had only two alternatives. He could rely only upon the exterior appearances of the vehicle before turning it over to the driver of the tow truck, or as in this case, he could make a *minimum* effort to assure the safety of persons and property.

We are not concerned with an inventory search after arrest or with a search for contraband. At the time the officer opened the door/window no such intent was present. So far as the officer knew, the only facts of concern were that two considerably intoxicated occupants of the vehicle were to be taken away, the vehicle was on the shoulder of a much traveled highway late at night and had to be hauled some distance for storage, and a loaded gun had been found on the seat between the two occupants.

The warrantless entry having been based upon these exigent circumstances, the immediate smelling of the marijuana odor was relevant only to the decision as to where the truck was to be stored, the full search of the truck and camper shell being postponed. The subsequent full search was with consent; the roadside entry was not for the purposes of inventory and subject to the vices outlined in *Mozzetti* v. *Superior Court* (1971) 4 Cal.3d 699 [94 Cal.Rptr. 412, 484 P.2d 84]. In *Mozzetti,* the court was most concerned with "the search *into* the closed suitcase" found within the vehicle. (*Id.,* at p. 707.) Nothing of that sort was attempted in this case.

■ Exigent circumstances have been defined as "an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property or to forestall the imminent escape of a suspect or destruction of evidence." (*People* v. *Ramey* (1976) 16 Cal.3d 263, 276 [127 Cal.Rptr. 629, 545 P.2d 1333], cert. den., *California* v. *Ramey* (1976) 429 U.S. 929 [50 L.Ed.2d 299, 97 S.Ct. 335].)

■ In *Ramey,* the court left leeway in its definition of exigent circumstances so that the particular facts of each case might be considered on a case-by-case basis: "There is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers." (*Ibid.*)

██ An automobile may be searched where exigent circumstances, as defined above, exist which make obtaining a warrant an impossible or impractical alternative. *(Wimberly* v. *Superior Court* (1976) 16 Cal.3d 557, 563 [128 Cal.Rptr. 641, 547 P.2d 417].)

The trial court has the power to resolve conflicts in testimony, and to resolve questions of fact, including what the officer actually believed. **(1b)** Its express finding that the abbreviated search was for officer safety is supported by substantial evidence. It has long been held that officer safety will justify a warrantless search: "This is a rule of necessity to which a right even as basic as that of privacy must bow. To rule otherwise would be inhumanely to add another hazard to an already very dangerous occupation. Our zeal to fend off encroachments upon the right of privacy must be tempered by remembrance that ours is a government of laws to preserve which we require law enforcement officers—live ones." *(People* v. *Koelzer* (1963) 222 Cal.App.2d 20, 27 [34 Cal.Rptr. 718].)

Long after the arrests and search in this case the officers involved probably learned of *Carney, supra,* 34 Cal.3d 597, and its rule that mobilehomes, and possibly similar vehicles, fall in a hybrid classification of part auto and part house for warrantless search purposes. Unaware of the potential application of the warrantless search limits to a van type vehicle which can be used as a mobile motel away from home, the officer in this case no doubt relied on rules used for car searches, or common sense if he was in doubt about the rule of law. We find no conflict in the officer's choice of action and the rationale of *Carney.*

In *Carney,* the court was presented with an expectation of privacy dilemma. The officer's warrantless entry was to a mobilehome located in a parking lot. The occupant was seen closing the vehicle's curtains. The trial court denied a suppression motion, concluding the entry was permitted under the automobile exception. Because such vehicles have dual purposes and mobility has been the principal reason for the automobile exception, the question arose whether the diminished expectation of privacy applicable to cars would also apply to mobilehomes. The court responded generally in the negative. Although the court was not concerned with a mobilehome stopped on a public highway, or a pickup truck with a camper shell, or a van, certain qualifications were expressed which apply here.

The key to *Carney* is this statement: "These principles hold true no less for the home resting on wheels than for the home resting on a cement foundation. In that the outward appearance of the motor home here would have alerted a reasonable person to believe it was likely to be serving as at

least a temporary residence, it was entitled to the protections traditionally given to a home." (*Id.,* at p. 609, fn. omitted.)

In its footnote to the foregoing observation, the court added: "Of course, even if the function of the structure or vehicle is not apparent from its exterior, the protections will come into play at whatever point a reasonable person would realize that the place being searched is serving as a home (e.g., from its furnishings or other residential accoutrements)." (*Id.,* at p. 610, fn. 7.)

In *Carney,* the court found it objectively apparent that the mobilehome was serving as a temporary living quarters and therefore the automobile exception did not apply. In our case the opposite conclusion is appropriate. Without at least a brief glance within the camper shell, it was not possible to find the home-away-from-home purpose to be significant. Before "the protections [came] into play" the officer smelled the odor of marijuana and backed off, postponing the search of the interior until later when the consent was obtained.

Our exigency facts were more demanding of prompt action than those in *People* v. *Chestnut* (1984) 151 Cal.App.3d 721 [198 Cal.Rptr. 8], in which a van was parked on a public street, not a highway necessitating its removal. However, under the circumstances the entry into the van interior was approved in *Chestnut.*

The "mobility factor" which applies to the automobile exception here created some of the "exigent circumstances" sometimes recognized as a separate exception to the warrant requirements. Both search warrant excuses were intertwined in these circumstances. In *Carney,* the officers claimed no exigent circumstances. (*People* v. *Carney, supra,* 34 Cal.3d at p. 610, fn. 8.) Unlike the facts in *Carney,* as observed by the court in a footnote, here it would not have been "quite simple for the officers to seek a warrant . . . ."

The judgment is affirmed.

Zenovich, Acting P. J., and Hanson (P.D.), J., concurred.