# CALIFORNIA *v.* CARNEY

No. 83–859. Argued October 30, 1984—Decided May 13, 1985

BURGER, C. J., delivered the opinion of the Court, in which WHITE, BLACKMUN, POWELL, REHNQUIST, and O'CONNOR, JJ., joined. STEVENS, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 395.

*Louis R. Hanoian*, Deputy Attorney General of California, argued the cause for petitioner. With him on the briefs were *John K. Van de Kamp*, Attorney General, *Steve White*, Chief Assistant Attorney General, and *Michael D. Wellington* and *John W. Carney*, Deputy Attorneys General.

*Thomas F. Homann* argued the cause for respondent. With him on the brief was *A. Dale Manicom.**

CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari to decide whether law enforcement agents violated the Fourth Amendment when they conducted a warrantless search, based on probable cause, of a fully mobile "motor home" located in a public place.

## I

On May 31, 1979, Drug Enforcement Agency Agent Robert Williams watched respondent, Charles Carney, ap-

*Briefs of *amici curiae* urging reversal were filed for the United States by *Solicitor General Lee, Assistant Attorney General Trott, Deputy Solicitor General Frey, Alan I. Horowitz*, and *Kathleen A. Felton;* and for the State of Minnesota et al. by *Hubert H. Humphrey III*, Attorney General of Minnesota, and *Thomas F. Catania, Jr.*, and *Paul R. Kempainen*, Special Assistant Attorneys General, *Jim Smith*, Attorney General of Florida, *Tany S. Hong*, Attorney General of Hawaii, and *Michael A. Lilly*, First Deputy Attorney General.

*Frank O. Bell, Jr.*, and *George L. Schraer* filed a brief for the California State Public Defender as *amicus curiae* urging affirmance.

proach a youth in downtown San Diego. The youth accompanied Carney to a Dodge Mini Motor Home parked in a nearby lot. Carney and the youth closed the window shades in the motor home, including one across the front window. Agent Williams had previously received uncorroborated information that the same motor home was used by another person who was exchanging marihuana for sex. Williams, with assistance from other agents, kept the motor home under surveillance for the entire one and one-quarter hours that Carney and the youth remained inside. When the youth left the motor home, the agents followed and stopped him. The youth told the agents that he had received marihuana in return for allowing Carney sexual contacts.

At the agents' request, the youth returned to the motor home and knocked on its door; Carney stepped out. The agents identified themselves as law enforcement officers. Without a warrant or consent, one agent entered the motor home and observed marihuana, plastic bags, and a scale of the kind used in weighing drugs on a table. Agent Williams took Carney into custody and took possession of the motor home. A subsequent search of the motor home at the police station revealed additional marihuana in the cupboards and refrigerator.

Respondent was charged with possession of marihuana for sale. At a preliminary hearing, he moved to suppress the evidence discovered in the motor home. The Magistrate denied the motion, upholding the initial search as a justifiable search for other persons, and the subsequent search as a routine inventory search.

Respondent renewed his suppression motion in the Superior Court. The Superior Court also rejected the claim, holding that there was probable cause to arrest respondent, that the search of the motor home was authorized under the automobile exception to the Fourth Amendment's warrant requirement, and that the motor home itself could be seized without a warrant as an instrumentality of the crime. Re-

spondent then pleaded *nolo contendere* to the charges against him, and was placed on probation for three years.

Respondent appealed from the order placing him on probation. The California Court of Appeal affirmed, reasoning that the vehicle exception applied to respondent's motor home. 117 Cal. App. 3d 36, 172 Cal. Rptr. 430 (1981).

The California Supreme Court reversed the conviction. 34 Cal. 3d 597, 668 P. 2d 807 (1983). The Supreme Court did not disagree with the conclusion of the trial court that the agents had probable cause to arrest respondent and to believe that the vehicle contained evidence of a crime; however, the court held that the search was unreasonable because no warrant was obtained, rejecting the State's argument that the vehicle exception to the warrant requirement should apply.[1] That court reached its decision by concluding that the mobility of a vehicle "is no longer the prime justification for the automobile exception; rather, 'the answer lies in the diminished expectation of privacy which surrounds the automobile.'" *Id.*, at 605, 668 P. 2d, at 811. The California Supreme Court held that the expectations of privacy in a motor home are more like those in a dwelling than in an automobile because the primary function of motor homes is not to provide transportation but to "provide the occupant with living quarters." *Id.*, at 606, 668 P. 2d, at 812.

We granted certiorari, 465 U. S. 1098 (1984). We reverse.

---

[1] Respondent contends that the state-court decision rests on an adequate and independent state ground, because the opinion refers to the State as well as the Federal Constitution. Respondent's argument is clearly foreclosed by our opinion in *Michigan* v. *Long*, 463 U. S. 1032, 1040–1041 (1983), in which we held, "when . . . a state court decision fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion, we will accept as the most reasonable explanation that the state court decided the case the way it did because it believed that federal law required it to do so." We read the opinion as resting on federal law.

## II

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." This fundamental right is preserved by a requirement that searches be conducted pursuant to a warrant issued by an independent judicial officer. There are, of course, exceptions to the general rule that a warrant must be secured before a search is undertaken; one is the so-called "automobile exception" at issue in this case. This exception to the warrant requirement was first set forth by the Court 60 years ago in *Carroll* v. *United States*, 267 U. S. 132 (1925). There, the Court recognized that the privacy interests in an automobile are constitutionally protected; however, it held that the ready mobility of the automobile justifies a lesser degree of protection of those interests. The Court rested this exception on a long-recognized distinction between stationary structures and vehicles:

> "[T]he guaranty of freedom from unreasonable searches and seizures by the Fourth Amendment has been construed, practically since the beginning of Government, as recognizing a necessary difference between a search of a store, dwelling house or other structure in respect of which a proper official warrant readily may be obtained, and a search of a ship, motor boat, wagon or automobile, for contraband goods, where it is not practicable to secure a warrant because the vehicle can be *quickly moved* out of the locality or jurisdiction in which the warrant must be sought." *Id.*, at 153 (emphasis added).

The capacity to be "quickly moved" was clearly the basis of the holding in *Carroll*, and our cases have consistently recognized ready mobility as one of the principal bases of the automobile exception. See, *e. g., Cooper* v. *California,* 386 U. S. 58, 59 (1967); *Chambers* v. *Maroney,* 399 U. S. 42, 52 (1970); *Cady* v. *Dombrowski,* 413 U. S. 433, 442 (1973);

*Cardwell* v. *Lewis*, 417 U. S. 583, 588 (1974); *South Dakota* v. *Opperman*, 428 U. S. 364, 367 (1976). In *Chambers*, for example, commenting on the rationale for the vehicle exception, we noted that "the opportunity to search is fleeting since a car is readily movable." 399 U. S., at 51. More recently, in *United States* v. *Ross*, 456 U. S. 798, 806 (1982), we once again emphasized that "an immediate intrusion is necessary" because of "the nature of an automobile in transit . . . ." The mobility of automobiles, we have observed, "creates circumstances of such exigency that, as a practical necessity, rigorous enforcement of the warrant requirement is impossible." *South Dakota* v. *Opperman, supra,* at 367.

However, although ready mobility alone was perhaps the original justification for the vehicle exception, our later cases have made clear that ready mobility is not the only basis for the exception. The reasons for the vehicle exception, we have said, are twofold. 428 U. S., at 367. "Besides the element of mobility, less rigorous warrant requirements govern because the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office." *Ibid.*

Even in cases where an automobile was not immediately mobile, the lesser expectation of privacy resulting from its use as a readily mobile vehicle justified application of the vehicular exception. See, *e. g., Cady* v. *Dombrowski, supra.* In some cases, the configuration of the vehicle contributed to the lower expectations of privacy; for example, we held in *Cardwell* v. *Lewis, supra,* at 590, that, because the passenger compartment of a standard automobile is relatively open to plain view, there are lesser expectations of privacy. But even when enclosed "repository" areas have been involved, we have concluded that the lesser expectations of privacy warrant application of the exception. We have applied the exception in the context of a locked car trunk, *Cady* v. *Dombrowski, supra,* a sealed package in a car trunk, *Ross, supra,* a closed compartment under the dashboard, *Cham-*

*bers* v. *Maroney, supra,* the interior of a vehicle's upholstery, *Carroll, supra,* or sealed packages inside a covered pickup truck, *United States* v. *Johns,* 469 U. S. 478 (1985).

These reduced expectations of privacy derive not from the fact that the area to be searched is in plain view, but from the pervasive regulation of vehicles capable of traveling on the public highways. *Cady* v. *Dombrowski, supra,* at 440–441. As we explained in *South Dakota* v. *Opperman,* an inventory search case:

> "Automobiles, unlike homes, are subjected to pervasive and continuing governmental regulation and controls, including periodic inspection and licensing requirements. As an everyday occurrence, police stop and examine vehicles when license plates or inspection stickers have expired, or if other violations, such as exhaust fumes or excessive noise, are noted, or if headlights or other safety equipment are not in proper working order." 428 U. S., at 368.

The public is fully aware that it is accorded less privacy in its automobiles because of this compelling governmental need for regulation. Historically, "individuals always [have] been on notice that movable vessels may be stopped and searched on facts giving rise to probable cause that the vehicle contains contraband, without the protection afforded by a magistrate's prior evaluation of those facts." *Ross, supra,* at 806, n. 8. In short, the pervasive schemes of regulation, which necessarily lead to reduced expectations of privacy, and the exigencies attendant to ready mobility justify searches without prior recourse to the authority of a magistrate so long as the overriding standard of probable cause is met.

When a vehicle is being used on the highways, or if it is readily capable of such use and is found stationary in a place not regularly used for residential purposes—temporary or otherwise—the two justifications for the vehicle exception

come into play.[2]  First, the vehicle is obviously readily mobile by the turn of an ignition key, if not actually moving. Second, there is a reduced expectation of privacy stemming from its use as a licensed motor vehicle subject to a range of police regulation inapplicable to a fixed dwelling.  At least in these circumstances, the overriding societal interests in effective law enforcement justify an immediate search before the vehicle and its occupants become unavailable.

While it is true that respondent's vehicle possessed some, if not many of the attributes of a home, it is equally clear that the vehicle falls clearly within the scope of the exception laid down in *Carroll* and applied in succeeding cases.  Like the automobile in *Carroll*, respondent's motor home was readily mobile.  Absent the prompt search and seizure, it could readily have been moved beyond the reach of the police. Furthermore, the vehicle was licensed to "operate on public streets; [was] serviced in public places; . . . and [was] subject to extensive regulation and inspection."  *Rakas* v. *Illinois*, 439 U. S. 128, 154, n. 2 (1978) (POWELL, J., concurring). And the vehicle was so situated that an objective observer would conclude that it was being used not as a residence, but as a vehicle.

Respondent urges us to distinguish his vehicle from other vehicles within the exception because it was *capable of functioning as a home*.  In our increasingly mobile society, many vehicles used for transportation can be and are being used not only for transportation but for shelter, *i. e.*, as a "home" or "residence."  To distinguish between respondent's motor home and an ordinary sedan for purposes of the vehicle exception would require that we apply the exception depending upon the size of the vehicle and the quality of its appointments.  Moreover, to fail to apply the exception to vehicles

---

[2] With few exceptions, the courts have not hesitated to apply the vehicle exception to vehicles other than automobiles.  See, *e. g.*, *United States* v. *Rollins*, 699 F. 2d 530 (CA11) (airplane), cert. denied, 464 U. S. 933 (1983).

such as a motor home ignores the fact that a motor home lends itself easily to use as an instrument of illicit drug traffic and other illegal activity. In *United States* v. *Ross*, 456 U. S., at 822, we declined to distinguish between "worthy" and "unworthy" containers, noting that "the central purpose of the Fourth Amendment forecloses such a distinction." We decline today to distinguish between "worthy" and "unworthy" vehicles which are either on the public roads and highways, or situated such that it is reasonable to conclude that the vehicle is not being used as a residence.

Our application of the vehicle exception has never turned on the other uses to which a vehicle might be put. The exception has historically turned on the ready mobility of the vehicle, and on the presence of the vehicle in a setting that objectively indicates that the vehicle is being used for transportation.[3] These two requirements for application of the exception ensure that law enforcement officials are not unnecessarily hamstrung in their efforts to detect and prosecute criminal activity, and that the legitimate privacy interests of the public are protected. Applying the vehicle exception in these circumstances allows the essential purposes served by the exception to be fulfilled, while assuring that the exception will acknowledge legitimate privacy interests.

## III

The question remains whether, apart from the lack of a warrant, this search was unreasonable. Under the vehicle exception to the warrant requirement, "[o]nly the prior approval of the magistrate is waived; the search otherwise [must be such] as the magistrate could authorize." *Ross, supra,* at 823.

---

[3] We need not pass on the application of the vehicle exception to a motor home that is situated in a way or place that objectively indicates that it is being used as a residence. Among the factors that might be relevant in determining whether a warrant would be required in such a circumstance is its location, whether the vehicle is readily mobile or instead, for instance, elevated on blocks, whether the vehicle is licensed, whether it is connected to utilities, and whether it has convenient access to a public road.

This search was not unreasonable; it was plainly one that the magistrate could authorize if presented with these facts. The DEA agents had fresh, direct, uncontradicted evidence that the respondent was distributing a controlled substance from the vehicle, apart from evidence of other possible offenses. The agents thus had abundant probable cause to enter and search the vehicle for evidence of a crime notwithstanding its possible use as a dwelling place.

The judgment of the California Supreme Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, dissenting.

The character of "the place to be searched"[1] plays an important role in Fourth Amendment analysis. In this case, police officers searched a Dodge/Midas Mini Motor Home. The California Supreme Court correctly characterized this vehicle as a "hybrid" which combines "the mobility attribute of an automobile . . . with most of the privacy characteristics of a house."[2]

The hybrid character of the motor home places it at the crossroads between the privacy interests that generally forbid warrantless invasions of the home, *Payton* v. *New York*, 445 U. S. 573, 585–590 (1980), and the law enforcement interests that support the exception for warrantless searches of automobiles based on probable cause, *United States* v. *Ross*, 456 U. S. 798, 806, 820 (1982). By choosing to follow the latter route, the Court errs in three respects: it has entered new

---

[1] The Fourth Amendment provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

[2] 34 Cal. 3d 597, 606, 668 P. 2d 807, 812 (1983).

territory prematurely, it has accorded priority to an exception rather than to the general rule, and it has abandoned the limits on the exception imposed by prior cases.

## I

In recent Terms, the Court has displayed little confidence in state and lower federal court decisions that purport to enforce the Fourth Amendment. Unless an order suppressing evidence is clearly correct, a petition for certiorari is likely to garner the four votes required for a grant of plenary review—as the one in this case did. Much of the Court's "burdensome" workload is a product of its own aggressiveness in this area. By promoting the Supreme Court of the United States as the High Magistrate for every warrantless search and seizure, this practice has burdened the argument docket with cases presenting fact-bound errors of minimal significance.[3] It has also encouraged state legal officers to file petitions for certiorari in even the most frivolous search and seizure cases.[4]

The Court's lack of trust in lower judicial authority has resulted in another improvident exercise of discretionary

---

[3] E. g., United States v. Johns, 469 U. S. 478 (1985); United States v. Sharpe, 470 U. S. 675 (1985); Oklahoma v. Castleberry, ante, p. 146. Cf. Florida v. Rodriguez, 469 U. S. 1, 12–13 (1984) (STEVENS, J., dissenting, joined by BRENNAN, J.).

[4] See, e. g., State v. Caponi, 12 Ohio St. 3d 302, 466 N. E. 2d 551 (1984), cert. denied, 469 U. S. 1209 (1985). The Court's inventiveness in the search and seizure area has also emboldened state legal officers to file petitions for certiorari from state court suppression orders that are explicitly based on independent state grounds. See, e. g., Jamison v. State, 455 So. 2d 1112 (Fla. App. 1984), cert. denied, 469 U. S. 1127 (1985); Ex parte Gannaway, 448 So. 2d 413 (Ala. 1984), cert. denied, 469 U. S. 1207 (1985); State v. Burkholder, 12 Ohio St. 3d 205, 466 N. E. 2d 176, cert. denied, 469 U. S. 1062 (1984); People v. Corr, 682 P. 2d 20 (Colo.), cert. denied, 469 U. S. 855 (1984); State v. Von Bulow, 475 A. 2d 995 (R. I.), cert. denied, 469 U. S. 875 (1984).

jurisdiction.[5]   In what is at most only a modest extension of our Fourth Amendment precedents, the California Supreme Court held that police officers may not conduct a nonexigent search of a motor home without a warrant supported by probable cause.   The State of California filed a petition for certiorari contending that the decision below conflicted with the authority of other jurisdictions.[6]   Even a cursory examination of the cases alleged to be in conflict revealed that they did not consider the question presented here.[7]

[5] *Michigan* v. *Long,* 463 U. S. 1032, 1065 (1983) (STEVENS, J., dissenting); *California* v. *Ramos,* 463 U. S. 992, 1029 (1983) (STEVENS, J., dissenting); *Watt* v. *Western Nuclear, Inc.,* 462 U. S. 36, 72–73 (1983) (STEVENS, J., dissenting); *Watt* v. *Alaska,* 451 U. S. 259, 273 (1981) (STEVENS, J., concurring).   See also Stevens, Some Thoughts on Judicial Restraint, 66 Judicature 177, 182 (1982).

[6] Pet. for Cert. 15–17, 21, 24–25.   The petition acknowledged that the decision below was consistent with dictum in two recent Ninth Circuit decisions.   See *United States* v. *Wiga,* 662 F. 2d 1325, 1329 (1981), cert. denied, 456 U. S. 918 (1982); *United States* v. *Williams,* 630 F. 2d 1322, 1326, cert. denied, 449 U. S. 865 (1980).

[7] Only one case contained any reference to heightened expectations of privacy in mobile living quarters.   *United States* v. *Cadena,* 588 F. 2d 100, 101–102 (CA5 1979) *(per curiam).*   Analogizing to automobile cases, the court upheld the warrantless search of an oceangoing ship while in transit. The court observed that the mobility "exception" required probable cause *and* exigency, and that "the increased measure of privacy that may be expected by those aboard a vessel mandates careful scrutiny both of probable cause for the search and the exigency of the circumstances excusing the failure to secure a warrant."   *Id.,* at 102.

In all of the other cases, defendants challenged warrantless searches for vehicles claiming either no probable cause or the absence of exigency under *Coolidge* v. *New Hampshire,* 403 U. S. 443 (1971).   *United States* v. *Montgomery,* 620 F. 2d 753, 760 (CA10) ("camper"), cert. denied, 449 U. S. 882 (1980); *United States* v. *Clark,* 559 F. 2d 420, 423–425 (CA5) ("camper pick-up truck"), cert. denied, 434 U. S. 969 (1977); *United States* v. *Lovenguth,* 514 F. 2d 96, 97 (CA9 1975) ("pick up with . . . camper top"); *United States* v. *Cusanelli,* 472 F. 2d 1204, 1206 (CA6) *(per curiam)* (two camper trucks), cert. denied, 412 U. S. 953 (1973); *United States* v. *Miller,* 460 F. 2d 582, 585–586 (CA10 1972) ("motor home"); *United States* v. *Rodgers,* 442 F. 2d 902, 904 (CA5 1971) ("camper truck"); *State* v. *Million,* 120

This is not a case "in which an American citizen has been deprived of a right secured by the United States Constitution or a federal statute.   Rather, . . . a state court has upheld a citizen's assertion of a right, finding the citizen to be protected under both federal and state law." *Michigan* v. *Long*, 463 U. S. 1032, 1067–1068 (1983) (STEVENS, J., dissenting).   As an unusually perceptive study of this Court's docket stated with reference to *California* v. *Ramos*, 463 U. S. 992 (1983), "this . . . situation . . . rarely presents a compelling reason for Court review in the absence of a fully percolated conflict."[8]   The Court's decision to forge ahead

Ariz. 10, 15–16, 583 P. 2d 897, 902–903 (1978) ("motor home"); *State* v. *Sardo*, 112 Ariz. 509, 513–514, 543 P. 2d 1138, 1142 (1975) ("motor home"). Only *Sardo* involved a vehicle that was not in transit, but the motor home in that case was about to depart the premises.

Two State Supreme Courts have upheld the warrantless search of mobile homes in transit, notwithstanding a claim of heightened privacy interests. See *State* v. *Mower*, 407 A. 2d 729, 732 (Me. 1979); *State* v. *Lepley*, 343 N. W. 2d 41, 42–43 (Minn. 1984).   Those cases—which were not cited in the petition for certiorari—are factually distinguishable from the search of the parked motor home here.   In any case, some conflict among state courts on novel questions of the kind involved here is desirable as a means of exploring and refining alternative approaches to the problem.

[8] Estreicher & Sexton, New York University Supreme Court Project, A Managerial Theory of the Supreme Court's Responsibilities (1984) (to be published in 59 N. Y. U. L. Rev. 677, 761 (1984)).   The study elaborated:

"[T]he Court should not hear cases in which a state court has invalidated state action on a federal ground in the absence of a conflict or a decision to treat the case as a vehicle for a major pronouncement of federal law. Without further percolation, there is ordinarily little reason to believe that the issue is one of recurring national significance.   In general, correction of error, even regarding a matter of constitutional law, is not a sufficient basis for Supreme Court intervention.   This last category differs from a federal court's invalidation of state action in that a structural justification for intervention is generally missing, given the absence of vertical federalism difficulties and the built-in assurance that state courts functioning under significant political constraints are not likely to invalidate state action lightly, even on federal grounds. . . . [The Court] should not grant . . . merely to correct perceived error." *Id.*, at 738–739 (footnote omitted).

Chief Justice Samuel Roberts, Retired, of the Pennsylvania Supreme Court has expressed similar concerns.   Roberts, The Adequate and Inde-

has established a rule for searching motor homes that is to be followed by the entire Nation. If the Court had merely allowed the decision below to stand, it would have only governed searches of those vehicles in a single State. The breadth of this Court's mandate counsels greater patience before we offer our binding judgment on the meaning of the Constitution.

Premature resolution of the novel question presented has stunted the natural growth and refinement of alternative principles. Despite the age of the automobile exception and the countless cases in which it has been applied, we have no prior cases defining the contours of a reasonable search in the context of hybrids such as motor homes, house trailers, houseboats, or yachts. In this case, the Court can barely glimpse the diverse lifestyles associated with recreational vehicles and mobile living quarters.[9] The line or lines separating mobile homes from permanent structures might have been drawn in various ways, with consideration given to whether the home is moving or at rest, whether it rests on land or water, the form of the vehicle's attachment to its location, its potential speed of departure, its size and capacity to serve as a domicile, and its method of locomotion. Rational decisionmaking strongly counsels against divining the uses and abuses of these vehicles in the vacuum of the first case raising the question before us.

Of course, we may not abdicate our responsibility to clarify the law in this field. Some caution, however, is justified when every decision requires us to resolve a vexing "conflict . . . between the individual's constitutionally protected interest in privacy and the public interest in effective law enforcement." *United States* v. *Ross*, 456 U. S., at 804. "The certainty that is supposed to come from speedy resolution

---

pendent State Ground: Some Practical Considerations, 17 IJA Rep., No. 2, pp. 1–2 (1985).

[9] See generally 45 Trailer Life, No. 1 (1985); *id.*, No. 2; 22 Motor Home, No. 1 (1985); *id.*, No. 2; 1 RV Lifestyle Magazine, No. 3 (1985).

may prove illusory if a premature decision raises more questions than it answers."[10]  The only true rules governing search and seizure have been formulated and refined in the painstaking scrutiny of case-by-case adjudication.  Consideration of this matter by the lower courts in a series of litigated cases would surely have facilitated a reasoned accommodation of the conflicting interests.  To identify rules that will endure, we must rely on the state and lower federal courts to debate and evaluate the different approaches to difficult and unresolved questions of constitutional law.[11]  Deliberation on the question over time winnows out the unnecessary

---

[10] Hellman, The Proposed Intercircuit Tribunal: Do We Need It?  Will It Work?, 11 Hastings Const. L. Q. 375, 405 (1984).

[11] "Although one of the Court's roles is to ensure the uniformity of federal law, we do not think that the Court must act to eradicate disuniformity as soon as it appears. . . . Disagreement in the lower courts facilitates percolation—the independent evaluation of a legal issue by different courts.  The process of percolation allows a period of exploratory consideration and experimentation by lower courts before the Supreme Court ends the process with a nationally binding rule.  The Supreme Court, when it decides a fully percolated issue, has the benefit of the experience of those lower courts.  Irrespective of docket capacity, the Court should not be compelled to intervene to eradicate disuniformity when further percolation or experimentation is desirable.

.          .          .          .          .

"Our system is already committed in substantial measure to the principle of percolation.  This is one justification for the absence of intercircuit stare decisis.  Similarly, state and federal courts daily engage in a process of 'dialectical federalism' wherein state courts are not bound by the holdings of lower federal courts in the same geographical area.  But more than past practice and the structure of the judicial system supports a policy of awaiting percolation before Supreme Court intervention.  A managerial conception of the Court's role embraces lower court percolation as an affirmative value.  The views of the lower courts on a particular legal issue provide the Supreme Court with a means of identifying significant rulings as well as an experimental base and a set of doctrinal materials with which to fashion sound binding law.  The occurrence of a conflict acts as a signaling device to help the Court identify important issues.  Moreover, the principle of percolation encourages the lower courts to act as responsible agents in the process of development of national law."  Estreicher & Sexton, *supra* n. 8, at 716, 719 (footnotes omitted).

and discordant elements of doctrine and preserves "whatever is pure and sound and fine."[12]

## II

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." We have interpreted this language to provide law enforcement officers with a bright-line standard: "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment— subject only to a few specifically established and well delineated exceptions." *Katz* v. *United States,* 389 U. S. 347, 357 (1967) (footnotes omitted); *Arkansas* v. *Sanders,* 442 U. S. 753, 758 (1979).

In *United States* v. *Ross,* the Court reaffirmed the primary importance of the general rule condemning warrantless searches, and emphasized that the exception permitting the search of automobiles without a warrant is a narrow one. 456 U. S., at 824–825. We expressly endorsed "the general rule," stated in *Carroll* v. *United States,* 267 U. S. 132, 156 (1925), that "'[i]n cases where the securing of a warrant is reasonably practicable, it must be used.'" 456 U. S., at 807. Given this warning and the presumption of regularity that attaches to a warrant,[13] it is hardly unrealistic to expect experienced law enforcement officers to obtain a search warrant when one can easily be secured.

The ascendancy of the warrant requirement in our system of justice must not be bullied aside by extravagant claims of necessity:

> "'The warrant requirement . . . is not an inconvenience to be somehow "weighed" against the claims of police efficiency. It is, or should be, an important working part

---

[12] B. Cardozo, The Nature of the Judicial Process 179 (1921).

[13] *United States* v. *Leon,* 468 U. S. 897, 913–914 (1984); *Illinois* v. *Gates,* 462 U. S. 213, 236–237 (1983).

of our machinery of government, operating as a matter of course to check the "well-intentioned but mistakenly over-zealous executive officers" who are a part of any system of law enforcement.' [*Coolidge* v. *New Hampshire,* 403 U. S. 443, 481 (1971).]

". . . By requiring that conclusions concerning probable cause and the scope of a search 'be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime' *Johnson* v. *United States,* 333 U. S. 10, 14 (1948), we minimize the risk of unreasonable assertions of executive authority." *Arkansas* v. *Sanders,* 442 U. S., at 758–759.

If the motor home were parked in the exact middle of the intersection between the general rule and the exception for automobiles, priority should be given to the rule rather than the exception.

## III

The motor home, however, was not parked in the middle of that intersection. Our prior cases teach us that inherent mobility is not a sufficient justification for the fashioning of an exception to the warrant requirement, especially in the face of heightened expectations of privacy in the location searched. Motor homes, by their common use and construction, afford their owners a substantial and legitimate expectation of privacy when they dwell within. When a motor home is parked in a location that is removed from the public highway, I believe that society is prepared to recognize that the expectations of privacy within it are not unlike the expectations one has in a fixed dwelling. As a general rule, such places may only be searched with a warrant based upon probable cause. Warrantless searches of motor homes are only reasonable when the motor home is traveling on the public streets or highways, or when exigent circumstances otherwise require an immediate search without the expenditure of time necessary to obtain a warrant.

As we explained in *Ross*, the automobile exception is the product of a long history:

> "[S]ince its earliest days Congress had recognized the impracticability of securing a warrant in cases involving the transportation of contraband goods. It is this impracticability, viewed in historical perspective, that provided the basis for the *Carroll* decision. Given the nature of an automobile in transit, the Court recognized that an immediate intrusion is necessary if police officers are to secure the illicit substance. In this class of cases, the Court held that a warrantless search of an automobile is not unreasonable." 456 U. S., at 806–807 (footnotes omitted).[14]

The automobile exception has been developed to ameliorate the practical problems associated with the search of vehicles that have been stopped on the streets or public highways because there was probable cause to believe they were transporting contraband. Until today, however, the Court has never decided whether the practical justifications that apply to a vehicle that is stopped in transit on a public way apply with the same force to a vehicle parked in a lot near a courthouse where it could easily be detained while a warrant is issued.[15]

---

[14] "As we have stated, the decision in *Carroll* was based on the Court's appraisal of practical considerations viewed in the perspective of history." 456 U. S., at 820.

[15] In *Coolidge* v. *New Hampshire*, 403 U. S. 443 (1971), a plurality refused to apply the automobile exception to an automobile that was seized while parked in the driveway of the suspect's house, towed to a secure police compound, and later searched:

"The word 'automobile' is not a talisman in whose presence the Fourth Amendment fades away and disappears. And surely there is nothing in this case to invoke the meaning and purpose of the rule of *Carroll* v. *United States*—no alerted criminal bent on flight, no fleeting opportunity on an open highway after a hazardous chase, no contraband or stolen goods or weapons, no confederates waiting to move the evidence, not even the inconvenience of a special police detail to guard the immobilized automobile. In short, by no possible stretch of the legal imagination can this be

In this case, the motor home was parked in an off-the-street lot only a few blocks from the courthouse in downtown San Diego where dozens of magistrates were available to entertain a warrant application.[16] The officers clearly had the element of surprise with them, and with curtains covering the windshield, the motor home offered no indication of any imminent departure. The officers plainly had probable cause to arrest the respondent and search the motor home, and on this record, it is inexplicable why they eschewed the safe harbor of a warrant.[17]

In the absence of any evidence of exigency in the circumstances of this case, the Court relies on the inherent mobility of the motor home to create a conclusive presumption of exigency. This Court, however, has squarely held that mobility of the place to be searched is not a sufficient justification for abandoning the warrant requirement. In *United States* v. *Chadwick*, 433 U. S. 1 (1977), the Court held that a warrantless search of a footlocker violated the Fourth Amendment even

---

made into a case where 'it is not practicable to secure a warrant.' [267 U. S., at 153,] and the 'automobile exception' despite its label, is simply irrelevant." *Id.*, at 461–462 (opinion of Stewart, J., joined by Douglas, BRENNAN, and MARSHALL, JJ.).

In *Cardwell* v. *Lewis*, 417 U. S. 583 (1974), a different plurality approved the seizure of an automobile from a public parking lot, and a later examination of its exterior. *Id.*, at 592–594 (opinion of BLACKMUN, J.). Here, of course, we are concerned with the reasonableness of the search, not the seizure. Even if the diminished expectations of privacy associated with an automobile justify the warrantless search of a parked automobile notwithstanding the diminished exigency, the heightened expectations of privacy in the interior of a motor home require a different result.

[16] See Suppression Hearing Tr. 7; Tr. of Oral Arg. 27. In addition, a telephonic warrant was only 20 cents and the nearest phone booth away. See Cal. Penal Code Ann. §§ 1526(b), 1528(b) (West 1982); *People* v. *Morrongiello*, 145 Cal. App. 3d 1, 9, 193 Cal. Rptr. 105, 109 (1983).

[17] This willingness to search first and later seek justification has properly been characterized as "a decision roughly comparable in prudence to determining whether an electrical wire is charged by grasping it." *United States* v. *Mitchell*, 538 F. 2d 1230, 1233 (CA5 1976) (en banc), cert. denied, 430 U. S. 945 (1977).

though there was ample probable cause to believe it contained contraband. The Government had argued that the rationale of the automobile exception applied to movable containers in general, and that the warrant requirement should be limited to searches of homes and other "core" areas of privacy. See *id.*, at 7. We categorically rejected the Government's argument, observing that there are greater privacy interests associated with containers than with automobiles,[18] and that there are less practical problems associated with the temporary detention of a container than with the detention of an automobile. See *id.*, at 13, and n. 7.

We again endorsed that analysis in *Ross:*

> "The Court in *Chadwick* specifically rejected the argument that the warrantless search was 'reasonable' because a footlocker has some of the mobile characteristics that support warrantless searches of automobiles. The Court recognized that 'a person's expectations of privacy in personal luggage are substantially greater than in an automobile,' [433 U. S., at 13], and noted that the practical problems associated with the temporary detention of a piece of luggage during the period of time necessary to obtain a warrant are significantly less than those associated with the detention of an automobile. *Id.*, at 13, n. 7." 456 U. S., at 811.

It is perfectly obvious that the citizen has a much greater expectation of privacy concerning the interior of a mobile home than of a piece of luggage such as a footlocker. If "inherent mobility" does not justify warrantless searches

---

[18] "The factors which diminish the privacy aspects of an automobile do not apply to respondent's footlocker. Luggage contents are not open to public view, except as a condition to a border entry or common carrier travel; nor is luggage subject to regular inspections and official scrutiny on a continuing basis. Unlike an automobile, whose primary function is transportation, luggage is intended as a repository of personal effects. In sum, a person's expectations of privacy in personal luggage are substantially greater than in an automobile." 433 U. S., at 13.

of containers, it cannot rationally provide a sufficient justification for the search of a person's dwelling place.

Unlike a brick bungalow or a frame Victorian, a motor home seldom serves as a permanent lifetime abode. The motor home in this case, however, was designed to accommodate a breadth of ordinary everyday living. Photographs in the record indicate that its height, length, and beam provided substantial living space inside: stuffed chairs surround a table; cupboards provide room for storage of personal effects; bunk beds provide sleeping space; and a refrigerator provides ample space for food and beverages.[19] Moreover, curtains and large opaque walls inhibit viewing the activities inside from the exterior of the vehicle. The interior configuration of the motor home establishes that the vehicle's size, shape, and mode of construction should have indicated to the officers that it was a vehicle containing mobile living quarters.

The State contends that officers in the field will have an impossible task determining whether or not other vehicles contain mobile living quarters. It is not necessary for the Court to resolve every unanswered question in this area in a single case, but common English usage suggests that we already distinguish between a "motor home" which is "equipped as a self-contained traveling home," a "camper" which is only equipped for "casual travel and camping," and an automobile which is "designed for passenger transportation."[20] Surely the exteriors of these vehicles contain clues about their different functions which could alert officers in the field to the necessity of a warrant.[21]

---

[19] Record, Ex. Nos. 102, 103.

[20] Webster's Ninth New Collegiate Dictionary 118, 199, 775 (1983).

[21] In refusing to extend the California Supreme Court's decision in *Carney* beyond its context, the California Courts of Appeal have had no difficulty in distinguishing the motor home involved there from a Ford van, *People* v. *Chestnut*, 151 Cal. App. 3d 721, 726–727, 198 Cal. Rptr. 8, 11 (1983), and a cab-high camper shell on the back of a pickup truck, *People* v. *Gordon*, 156 Cal. App. 3d 74, 82, 202 Cal. Rptr. 566, 570 (1984). There is no reason to believe that trained officers could not make similar dis-

The California Vehicle Code also refutes the State's argument that the exclusion of "motor homes" from the automobile exception would be impossible to apply in practice. In its definitional section, the Code distinguishes campers and house cars from station wagons, and suggests that they are special categories of the more general terms—motor vehicles and passenger vehicles.[22] A "house car" is "a motor vehicle originally designed, or permanently altered, and equipped for human habitation, or to which a camper has been permanently attached."[23] Alcoholic beverages may not be opened or consumed in motor vehicles traveling on the highways, except in the "living quarters of a housecar or camper."[24] The same definitions might not necessarily apply in the context of the Fourth Amendment, but they do indicate that descriptive distinctions are humanly possible. They also reflect the California Legislature's judgment that "house cars" entertain different kinds of activities than the ordinary passenger vehicle.

In my opinion, searches of places that regularly accommodate a wide range of private human activity are fundamentally different from searches of automobiles which primarily serve a public transportation function.[25] Although it may not be a castle, a motor home is usually the functional equivalent of a hotel room, a vacation and retirement home, or a hunting and fishing cabin. These places may be as spar-

---

tinctions between different vehicles, especially when state vehicle laws already require them to do so.

[22] Cal. Veh. Code Ann. §§ 243, 362, 415, 465, 585 (West 1971 and Supp. 1985).

[23] § 362 (West 1971).

[24] §§ 23221, 23223, 23225, 23226, 23229 (West Supp. 1985).

[25] Cf. *Cardwell* v. *Lewis*, 417 U. S., at 590 (opinion of BLACKMUN, J.): "One has a lesser expectation of privacy in a motor vehicle because its function is transportation, and it seldom serves as one's residence or as the repository of personal effects. A car has little capacity for escaping public scrutiny. It travels public thoroughfares where both its occupants and its contents are in plain view."

tan as a humble cottage when compared to the most majestic mansion, 456 U. S., at 822; *ante,* at 393, but the highest and most legitimate expectations of privacy associated with these temporary abodes should command the respect of this Court. *Stoner* v. *California,* 376 U. S. 483, 490 (1964); *Payton* v. *New York,* 445 U. S., at 585; *United States* v. *Karo,* 468 U. S. 705, 714–715 (1984).[26]   In my opinion, a warrantless search of living quarters in a motor home is "presumptively unreasonable absent exigent circumstances." *Ibid.*

I respectfully dissent.

---

[26] "At the risk of belaboring the obvious, private residences are places in which the individual normally expects privacy free of governmental intrusion not authorized by a warrant, and that expectation is plainly one that society is prepared to recognize as justifiable.   Our cases have not deviated from this basic Fourth Amendment principle.   Searches and seizures inside a home without a warrant are presumptively unreasonable absent exigent circumstances." *United States* v. *Karo,* 468 U. S., at 714–715.