NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0440n.06
Filed: June 27, 2006

No. 05-6448

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | ON APPEAL FROM THE |
| *Plaintiff-Appellee,* | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| v. | ) | DISTRICT OF KENTUCKY |
| | ) | |
| **BRUCE HEALD,** | ) | **O P I N I O N** |
| | ) | |
| *Defendant-Appellant.* | ) | |

**BEFORE:** **KENNEDY, COLE, Circuit Judges; and VARLAN, District Judge.**[*]

**R. GUY COLE, JR., Circuit Judge.** Defendant-Appellant Bruce Heald appeals the district court's order denying his motion to suppress evidence obtained from a warrantless search of Heald's vehicle. Heald argues that the warrantless search of his Jeep Cherokee violated his Fourth Amendment rights, and argues that no exception to the general prohibition against warrantless searches exempts the seized evidence from the exclusionary rule. For the following reasons, we affirm the district court's order denying Heald's motion to suppress.

**I.**

At 4:00 a.m. on June 4, 2002, Greg Torbert saw a black Jeep Cherokee drive in front of his house in Florence, Kentucky, and then turn down a small street that ran behind the house. Torbert

_____

[*]The Honorable Thomas A. Varlan, United States District Court for the Eastern District of Tennessee, sitting by designation.

watched as the Jeep turned around a cul-de-sac, stopped in front of one of two partially constructed homes, and turned off its lights. About thirty seconds later, the car's lights were turned on, and the car drove to the next house, another partially constructed home. The car's lights were turned off again. Torbert testified at an evidentiary hearing that his view of the vehicle was obstructed. Torbert went outside and sat on his back porch for approximately five minutes to watch the car, and began hearing a "metallic, clanging noise" coming from the second unfinished home.

Based on his belief that an unauthorized person was in that house, Torbert decided to call the police. While Torbert searched for a phone, the car drove southwest, away from the unfinished house, and parked with its lights off on an undeveloped portion of the street. About ten minutes later, the car returned, and again parked in front of the second partially constructed house. At that point, Tolbert called the police.

When the police arrived and parked in front of the first house, Tolbert saw a man exit the second home. Tolbert, who was on the phone with 911,[1] told the operator that the man was running through the lot, and that the man ran south towards the undeveloped area. Tolbert described the man as being 180 pounds, between 5'10" and 5'11", and wearing dark clothing. Tolbert did not see the man again.

Sergeant Jim Wermeling of the Boone County Sheriff's Department, responding to the report of a suspicious vehicle on that street, arrived at the scene at about 5:18 a.m. Wermeling noticed that the Jeep's Kentucky license plate was affixed with heavy duct tape to an Oregon license plate. The

---

[1]Tolbert testified that he could not remember if he called 911 a second time, or if he remained on the phone with them continuously.

Oregon plate and the license-plate light were also covered with duct tape. Wermeling called the Boone County dispatch, and learned that the Kentucky plate was registered to a Dodge pickup truck, whose owner had previously reported that he had simply lost the plate. Wermeling also learned that the Oregon plate was registered to a black 2001 Jeep Limited; that Jeep was registered to Thor Trust, and Bruce Heald was the trustee. Wermeling testified that the Jeep was uninsured.

Wermeling searched the second unfinished home, as well as two other residences, but found nothing amiss. He shined his flashlight into the Jeep, and observed papers, including receipts indicating that the driver had been recently staying at a hotel. Wermeling, believing that the Jeep was stolen, and that evidence of that crime could be found inside the Jeep, requested the impounding of the vehicle. When a truck arrived to tow the Jeep, Wermeling requested that the truck operator unlock the Jeep's door, which the operator was unable to do because of a lack of tools. Wermeling escorted the car to the police impound lot, where the Jeep was forcibly unlocked. When the door to the Jeep was opened, the vehicle's alarm sounded. Wermeling thereupon found the keys to the Jeep in the glove-box, as well as hotel receipts, Heald's driver's license, and a bag containing a machine gun, extra magazines of ammunition, and a shoulder holster for a handgun. Wermeling testified that he was concerned when he did not find a handgun that matched the shoulder holster, because he believed that whoever left the Jeep without the holster was armed. After finding the machine pistol, Wermeling requested a search warrant. A search warrant was obtained by 4:00 p.m. on June 4. At no time did anyone attempt to claim the car, and after finding the keys in the glove-box, Wermeling did not believe the Jeep's owner would return.

On June 9, a truck was reported stolen from a construction site about seven miles from the partially constructed homes. Several witnesses reported seeing a man who matched Heald's description around the construction site at the time of the theft. On June 11, a man driving the stolen truck arranged to meet Greg Osborn, who had placed an advertisement in the newspaper to sell his motorcycle. The man who was driving the stolen truck took the motorcycle for a test-drive, but did not return with it, thus leaving Osborn with the stolen truck. On July 4, the motorcycle was located in front of a Red Roof Inn in Pigeon Forge, Tennessee. Heald was seen loitering around the lobby of the hotel, although was not a registered guest. The hotel called the police, who arrested Heald. Heald was in possession of the keys to the motorcycle, as well as keys to the Jeep.[2]

On June 11, 2003, Heald was indicted on five counts, including possessing a firearm after being convicted of domestic violence, in violation of 18 U.S.C. § 922(g)(9). Heald moved to suppress evidence found in the Jeep based on the warrantless search, including a silencer, machine gun, ammunition, letter indicating that Heald was planning to committ suicide, a camouflage knapsack, maps to Heald's ex-girlfriend's home (which was near the unfinished homes), bad-weather gear, dried fruit, peanut butter, and an empty shoulder holster. After a hearing, the district court denied Heald's motion to suppress.

**II.**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Generally, this right is

---

[2]On November 19, 2003, Heald pled guilty in Boone Count Circuit Court to felony offenses related to the thefts of the various vehicles.

preserved by the requirement that a police officer obtain a warrant before conducting a search. *California v. Carney*, 471 U.S. 386, 390 (1985). Exceptions to that general rule include the "automobile exception," which allows police officers to make a warrantless search of a vehicle if they have probable cause, even in the absence of exigent circumstances. *Carney*, 471 U.S. at 390 (holding that police could search mobile home without a warrant when it had probable cause); *United States v. Markham*, 844 F.2d 366, 396 (6th Cir. 1988) (holding that police could conduct a warrantless search of a mobile home that was registered to defendant who was supposed to receive a large shipment of marijuana, and when officers smelled marijuana). Probable cause is generally defined as "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir. 1993) (en banc) (quotations omitted). The probable cause doctrine "is a flexible, commonsense standard [that] requires that the facts available to the officer would warrant a man of reasonable caution" to believe that a crime is afoot." *Id.*

In the context of a suppression hearing, this Court defers to a district court's factual findings unless they are clearly erroneous, but reviews that court's legal conclusions *de novo*. *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004). The district court concluded that here, the police had probable cause to search the Jeep. The district court noted that: (1) Torbert called 911 at 4 a.m.; (2) Torbert heard noises coming from the partially constructed home; (3) Wermeling knew that the suspect fled from the partially constructed home; (4) the Jeep's Kentucky license plate had been stolen; (5) the license plate illumination lights had been taped-over; (6) the stolen Kentucky plate

was affixed to an Oregon plate; (7) the Jeep was uninsured; and (8) Wermeling saw local hotel receipts in the Jeep, leading him to believe that the Jeep had been stolen from a local hotel or airport.

Heald argues that the police did not have probable cause to believe that a crime had been committed. He argues that Wermeling searched the car in order to determine its owner, not because he believed that the car contained contraband. Heald focuses on the fact that Wermeling admitted that he could not request canine assistance with the search, because he did not know at the time of the search that he was investigating a felony.[3] Heald's arguments are unavailing. Although the evidence does suggest that Wermeling did not have probable cause to believe that a felony took place upon immediately arriving on the scene, Wermeling certainly had probable cause to believe that a felony had taken place upon learning that the Kentucky license plate had been stolen. In Kentucky, displaying a "cancelled" license plate is prima facie evidence of theft of a vehicle registration plate, a Class D felony. *See* KRS § 186.990. Furthermore, Heald's argument that Wermeling did not *believe* he was investigating a felony is unpersuasive; in order to determine if probable cause exists, this Court does not consider the subjective intent of the officers, but rather only looks at the objective factors known to the officers of the time of the search. *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) ("Our cases make clear that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause.").

Based on the fact that Wermeling knew that the Kentucky license plate had been reported lost before the search began, he had probable cause to search the Jeep. Because we conclude that

---

[3]Apparently, for liability reasons, the police department will not provide canine-assistance unless the officer at the scene is positive that they are investigating a felony.

Officer Wermeling had probable cause sufficient to conduct a warrantless search of the Jeep, we need not determine whether Heald had a reasonable expectation of privacy in the Jeep,[4] or whether he abandoned that vehicle.

## V. CONCLUSION

For the foregoing reasons, we **AFFIRM** the order of the district court denying Heald's motion to suppress.

---

[4]Although the district court and the parties discuss whether [Heald] had a legitimate expectation of privacy as an issue of 'standing,' the Supreme Court expressly rejected using a standing analysis in *Rakas v. Illinois*, 439 U.S. 128, 139-140 (1978). *See also Minnesota v. Carter*, 525 U.S. 83, 87 (1998). Thus, we need not determine whether Heald had standing to challenge the search before reaching other arguments raised by the parties.